GIBSON, Plaintiff in error, v. STATE, Defendant in error.

*No. State 114.  Argued May 2, 1972.—Decided June 6, 1972.*
(Also reported in 197 N. W. 2d 813.)

For the plaintiff in error there was a brief by *Dexter D. Black* and *Brown, Black & Riegelman,* all of Racine, and oral argument by *Dexter D. Black.*

For the defendant in error the cause was argued by *Donald W. Smith,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HALLOWS, C. J.    Many of the facts are not in dispute. Gibson signed a statement admitting he killed Patricia Green. He stated he picked her up about 11 p. m. from her job as a nurse's aide and drove to a secluded spot

where they had sexual intercourse. She became frightened and threatened to tell her father. He reached for a hammer from the backseat as she jumped out of the car and started to run up the road. He caught up with her and hit her a glancing blow on the forehead. She fell down and continued to scream that she was going to tell her father. He struck her several more times but her screaming continued so he tried to choke her. He finally hit her on the head and her screaming stopped. He picked up her body, carried it into a field and threw it along a fence. He again struck her with the hammer on the chest. He wiped his fingerprints off the hammer with his cap, threw the hammer in the bushes and left the scene. He noticed the victim's purse was in his car, drove to the lake and threw it in. He returned later to the scene and tried to remove his fingerprints from the body and to cover up his footprints.

Gibson testified he did not intend to kill his sister-in-law, that he was in a chronic nervous condition and he had just been laid off his job and turned down on a loan application, that he had taken two pills given to him by his brother-in-law Wade Green and had a couple of beers to relax him. After that he felt strange and dizzy, had trouble judging distances and "was in a trance," "lightheaded and peculiar," and "in a fog." While he knew what he was doing, he could not control himself. Two doctors testified that on the symptoms related by Gibson his reactions were consistent with the taking of amphetamines combined with beer. It was their opinion Gibson, because of the effect of the drug and beer, was "not capable of forming an intent."

This testimony the jury could justifiably reject because the question of whether Gibson took amphetamines depended entirely upon his credibility. Gibson in his confession mentioned nothing about taking pills or being under the influence of a drug. While he claims he did

not want to involve Green until he could find out whether Green was really a pusher of narcotics, his testimony in this respect was contradictory. He admitted that while in jail he talked to other prisoners who told him how they felt when they took amphetamines. Finally, Wade Green denied giving Gibson any pills on the evening of the murder or that he saw anything strange about Gibson's manner that evening when he was with him.

But even if the jury believed Gibson, the evidence was insufficient. Intoxication or a drugged condition to be a defense under sec. 939.42, Stats., must be either an involuntarily produced condition which renders the actor incapable of distinguishing between right and wrong in respect to the alleged criminal act at the time of its commission or a condition which negates the existence of the state of mind essential to the crime. *Roberts v. State* (1968), 41 Wis. 2d 537, 164 N. W. 2d 525. The evidence on the alleged drugged condition of Gibson does not show it was involuntarily produced or that it contradicted or disproved he had an intent to kill or rendered him incapable of forming the intent to kill. This court has several times passed upon the degree of intoxication, which is equated with a drugged condition in the statute, necessary to render one incapable of forming and entertaining a *mens rea* under sec. 939.42. *Smith v. State* (1946), 248 Wis. 399, 21 N. W. 2d 662; *Lasecki v. State* (1926), 190 Wis. 274, 208 N. W. 868; *State v. Christiansen* (1936), 222 Wis. 132, 267 N. W. 6; Annot. (1966), *Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge*, 8 A. L. R. 3d 1236; *see also: State v. Guiden* (1970), 46 Wis. 2d 328, 174 N. W. 2d 488.

Sec. 939.42, Stats., affords no refuge to Gibson. The evidence supports a view he had the intent to kill Patricia Green to prevent her from telling her father

Gibson had had intercourse with her. Intent is a state of mind of the actor existing at the time he commits the offense, and his state of mind may be determined from his acts, conduct and inferences fairly deducible from the circumstances. *Strait v. State* (1969), 41 Wis. 2d 552, 559, 164 N. W. 2d 505; *State v. Guiden, supra,* at 332, n. 4; *Jacobs v. State* (1971), 50 Wis. 2d 361, 366, 184 N. W. 2d 113. So it is with the intent to kill— it may be inferred from the circumstances and character of the act of killing itself. *Farino v. State* (1931), 203 Wis. 374, 379, 234 N. W. 366. In the process the state is aided by a rebuttable presumption that a person intends the natural and probable consequences of his acts. *Cupps v. State* (1904), 120 Wis. 504, 513, 97 N. W. 210, 98 N. W. 546; *Farino v. State, supra,* at 380; *Gelhaar v. State* (1969), 41 Wis. 2d 230, 243, 163 N. W. 2d 609. Gibson admitted that when Patricia Green ran from the car he chased her with a hammer because "I wanted to stop her from screaming." The chase, the repeated blows from the hammer, the attempted strangulation, the moving of the body and the final smash to the chest obviously consumed some time. The murder was not the result of a single act but a series of them. Gibson had the presence of mind to try to wipe the hammer clean of fingerprints, to dispose of her purse, to return to the scene to cover up incriminating evidence and to cut off his bloody pants legs and to dispose of them. When he returned to his father-in-law's home he said nothing of what had happened but pretended to be concerned about Patricia Green's disappearance and to help in locating her. At the most, Gibson's story shows the alleged drug affected his judgment and self-control but did not render him incapable of intending to kill.

On the issue of insanity, Drs. Johnson and Bacon both testified that in their opinion Gibson was in such a drugged condition at the time of the murder that he

was suffering from a mental defect or disease and he was not able to conform his conduct to the requirement of the law. We do not consider that a voluntarily drugged condition is a form of insanity which under the American Law Institute test of insanity can constitute a mental defect or a disease.[1] The medical testimony could hardly be used both on the issue of guilt to prove lack of intent and also to prove insanity. Such testimony raises the problem discussed in *State v. Hebard* (1971), 50 Wis. 2d 408, 184 N. W. 2d 156, where we stated that evidence of insanity was not admissible on the question of intent. Here, we have evidence of lack of intent being admitted on the question of insanity. The question of insanity is a policy question, *i.e.*, whether the defendant is to be excused from criminal responsibility because of the effect on his volitional ability caused by certain mental defects or diseases. An insane person may not intend an act, but a person who commits an act without intent is not necessarily insane.

Prior to the trial, Gibson had been committed to Central State Hospital to determine whether he was mentally capable of standing trial. The sixty-day report on fitness for trial was referred to by Dr. Johnson in his testimony on the issue of guilt. Dr. Johnson in his opinion relied on the portion of the report which consisted of the psychologist's tests concerning I. Q. and personality. However, the trial court admitted the entire report and Gibson claims the admission of this exhibit in its entirety was error. The state seeks to justify its admission under sec. 889.25, Stats., the Business Records Act. But it seems plain it was error to admit the entire report.

---

[1] American Law Institute, *Model Penal Code*, p. 66, sec. 4.01 (1), Proposed Official Draft (1962); *State v. Shoffner* (1966), 31 Wis. 2d 412, 143 N. W. 2d 458.

Under the rule of *Lewandowski v. Preferred Risk Mut. Ins. Co.* (1966), 33 Wis. 2d 69, 146 N. W. 2d 505, that part of the report relied on by Dr. Johnson and consisting of tests and even expert opinions could be admitted for impeachment purposes and to test the validity of the doctor's opinion which relied thereon. This rule was affirmed in *Vinicky v. Midland Mut. Casualty Ins. Co.* (1967), 35 Wis. 2d 246, 256, 151 N. W. 2d 77. But as pointed out in *Vinicky,* an adverse party cannot thus put in evidence irrelevant, incompetent, or prejudicial material which may be contained in the report and the party objecting to the introduction of such inadmissible portion of the document should ask the court to delete or excise the offending portions. Here, a considerable part of the report not used by Dr. Johnson was immaterial. The most important part was a concluding opinion that Gibson was competent to stand trial. But we do not think the immaterial parts of the report were prejudicial or harmful to Gibson. If Gibson was not competent to stand trial, there would have been no trial. His defense was not based on permanent insanity but an alleged form of temporary insanity caused by the ingestion of two pills on the night of the murder and not on any chronic psychosis. We do not reach the question of whether a medical opinion in a hospital record is admissible in evidence as direct proof of the fact under sec. 889.25, Stats., as a business entry.[2]

It is also argued it was error to let the sixty-day report go into the jury room. What evidence should be admitted to the jury room is within the discretion of the trial court. *Starke v. Wolf* (1895), 90 Wis. 434,

---

[2] For a review of the admissibility of hospital records under this section and in regard to opinions and diagnoses in such records as distinguished from medical theories, *see* Holz, *A Survey of Rules Governing Medical Proof in Wisconsin,* 1970 Wis. L. Rev. 989.

438, 63 N. W. 755; *Schnepf v. Rosenthal* (1972), 53 Wis. 2d 268, 272, 193 N. W. 2d 32. We see no additional prejudice or harmfulness resulting from allowing this inadmissible evidence to go into the jury room.

Gibson claims the trial court should have ruled him insane as a matter of law because the state failed to produce any witnesses on the insanity issue. This argument assumes the defendant's proof had to be accepted by the jury and was sufficient. No proof is required by the state when the defendant elects to proceed under the ALI test because by such an election the defendant has the burden of convincing the jury of his insanity to a reasonable certainty by the greater weight of the evidence. *See State v. Shoffner, supra,* at 427; *State v. Hebard, supra; State v. Bergenthal* (1970), 47 Wis. 2d 668, 685, 686, 178 N. W. 2d 16. The jury need not accept the medical testimony on behalf of Gibson even though it was uncontradicted. Consequently, there is no merit in the argument.

It is argued by Gibson the evidence is insufficient to support the trial court's finding that his confession was voluntary. On March 4, 1970, Gibson agreed to accompany the Racine detectives to the state crime laboratory in Madison to take a lie-detector examination. However, after being examined preliminary to the test, Gibson balked at continuing. That night back in Racine he confessed and signed state's Exhibit 1. The statement contains a recital of the Miranda [3] rights and a separate waiver of these rights. It is claimed this waiver was not freely and voluntarily signed for various reasons. He was in the company of the police from 8 a. m. to 10:44 p. m. before he confessed, but since this period includes Gibson's voluntary appearance with the detectives while making the trip to Madison to

[3] *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694.

take the lie-detector test, he was not in legal custody of the police. There was the psychological pressure of the lie-detector test which he voluntarily agreed to take and then voluntarily changed his mind. However, the promptings of one's own conscience is not such pressure as will void a free choice to waive constitutional rights, *State v. Chabonian* (1971), 50 Wis. 2d 574, 579, 185 N. W. 2d 289, and one must distinguish between motivation in making a free choice and such force as will overcome the freedom of the will in making a choice of conduct. All choices are motivated but this does not mean they are forced or involuntary. It is argued that coercion is evidenced by a statement of the police officer that Gibson would be a prime suspect if he refused to take the lie-detector test. This had no effect because Gibson refused to take the test. It is probably true Gibson had little sleep the night before he confessed but his lack of sleep was of his own doing, and the police did not deprive him of sleep. It is claimed the police used trickery to get Gibson to confess by making a false claim that Detective Nelson saw him at the murder scene the night of the murder. The facts are in dispute. The detective's version is he told Gibson he saw a colored couple parked in the area but admitted to him he could not swear it was he. The trier of the fact accepted the police version. It is argued the detective told Gibson that if he gave a statement, the detective would testify the death was accidental and he would be charged only with second-degree murder and that the police would intercede on his behalf. Such promises and representations were denied by the detectives. Finally, it is claimed Gibson was told he did not need an attorney. This is denied by the detectives and Gibson admits they did read to him his rights and he knew he could have an attorney.

Findings of fact on the issue of voluntariness generally involve credibility of witnesses and the weight of the testimony to be given. The finding of voluntariness made by the trial court is not against the great weight and clear preponderance of the evidence and therefore should be affirmed. *See: State v. Carter* (1966), 33 Wis. 2d 80, 89–91, 146 N. W. 2d 466; *Greenwald v. State* (1967), 35 Wis. 2d 146, 150, 151, 150 N. W. 2d 507; *State v. Herro* (1971), 53 Wis. 2d 211, 215, 191 N. W. 2d 889.

Gibson moved for a change of venue and offered 16 Racine newspaper stories telling of the killing and the charging of Gibson with the crime. The motion was denied without prejudice to see if a *voir dire* would show prejudice. Five of the first 25 jurors were excused because they had formed an opinion based on newspaper stories. While the United States Supreme Court has cautioned against giving complete deference to a trial judge in this sensitive area, *Sheppard v. Maxwell* (1966), 384 U. S. 333, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600; *see also Estes v. Texas* (1965), 381 U. S. 532, 85 Sup. Ct. 1628, 14 L. Ed. 2d 543, the question does rest generally in his sound discretion. *Thomas v. State* (1972), 53 Wis. 2d 483, 490, 192 N. W. 2d 864, and cases cited therein. In *Thomas*, at 491, this court cited the American Bar Association's *Standards Relating to Fair Trial and Free Press* (Approved Draft, 1968), Standard 3.2, stating while actual prejudice need not be shown, there must be a showing of a reasonable probability of prejudice inherent in the situation.

While in the days between the slaying and the arrest of Gibson the story of the investigation received considerable publicity, it cannot be said the news stories were of an inflammatory nature. In *Thomas* this court recognized the type of news is important: "Uneditorial-

ized news of purely informational nature may inform possible members of a jury but such news does not necessarily create prejudice. An informed jury is not necessarily a prejudicial one. There is no claim here of editorialized news, of rabble rousing, or of an attempt to form public opinion against [the defendant]. . . ." 53 Wis. 2d at 492. Taking the entire period of time from the murder to trial it is fair to say, as in *Thomas,* there was no massive news coverage or daily repetition to excite the public.

Lastly, Gibson argues it was error for the trial court not to admit Exhibit A–1, which is a hospital record of his reaction to a sleeping pill in May, 1970. If this was error, it was harmless because both his doctors testified to and discussed that part of the hospital record Gibson claims was significant and related to his apparent unusual or extreme reaction to sleeping pills. Gibson's sensitivity to drugs was adequately before the jury.

*By the Court.*—Order affirmed.