STATE, Respondent, v. KOLISNITSCHENKO, Appellant.

*No. 76–166–CR. Argued April 5, 1978.—Decided June 30, 1978.*
(Also reported in 267 N.W.2d 321.)

For the appellant there was a brief and oral argument by *Myron P. Keyes* of Kenosha.

For the respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

SHIRLEY S. ABRAHAMSON, J. At 1:40 a.m., November 11, 1974, Michael Kolisnitschenko broke into the home of a neighbor, Palma Griffiths, and killed her by stabbing her seventeen times. In the first part of his bifurcated trial, he was found guilty of murder. In the second part, the jury rejected Kolisnitschenko's defense that he was not guilty by reason of mental disease or defect. The jury reached that conclusion despite the testimony of Dr. Crowley, a psychiatrist, and Dr. Lic-

cione, a clinical psychologist, that at the time of the murder Kolisnitschenko was psychotic. The two doctors concluded that because of his psychotic condition, Kolisnitschenko was unable to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Kolisnitschenko now asserts that the jury's verdict regarding his insanity defense was the result of an erroneous instruction it received from the trial court.

Kolisnitschenko and a friend of his testified that during the twelve hours preceding the murder, Kolisnitschenko had consumed a variety of drugs including eight to ten amphetamine tablets, beer, Champale, 10 mixed alcoholic drinks, and a third of an ounce of marijuana. Around midnight, less than two hours before the murder, when Kolisnitschenko and his companion were driving in the country and smoking marijuana, both experienced an "eerie" feeling. They said the feeling persisted for ten or fifteen minutes; they felt as if another presence had entered the car or as if they had received a 1,000 volt electrical shock. On the drive home, Kolisnitschenko began having premonitions which involved a figure and a body lying on the floor. When they pulled up to his house, Kolisnitschenko was talking about something evil happening. Glimpsing Griffiths' house across the street, he said it would happen there. The premonition persisted, and Kolisnitschenko asked his friend to take him away from that neighborhood. The friend reassured him that nothing would happen and then left.

Kolisnitschenko testified that he perceived the murder as if it occurred in a dream. He seemed to be following a shadow figure as it entered the house and stabbed Mrs. Griffiths. About 2 a.m. Kolisnitschenko called the friend with whom he had been driving and said, "Remember what we were talking about. I did it."

On this appeal, Kolisnitschenko challenges the trial court's instructions to the jury relating to the circum-

stances under which one will be relieved of responsibility for criminal conduct by reason of mental disease. The court's instructions were, in pertinent part, as follows:

"A person is not responsible for his criminal conduct if at the time of such conduct he had a mental disease so as to lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."[1]

" . . .

"A mental disease which is the product of a voluntarily induced state of intoxication by drugs or alcohol or both does not constitute a mental disease which is recognized as a defense by the law."[2]

[1] This statement embodies the American Law Institute's test of criminal responsibility in insanity cases. *See* American Law Institute, Model Penal Code, sec. 4.01, Proposed Official Draft (1962); *Schoffner v. State,* 31 Wis.2d 412, 427, 143 N.W.2d 458 (1976).

Sec. 971.15, Stats., provides:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

"(2) As used in this chapter, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

"(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence."

[2] Similarly Kolisnitschenko alleges that the court committed reversible error in giving the following instruction to the jury at the conclusion of Dr. Liccione's testimony:

"Dr. Liccione referred to by reason of a question asked of him by defense counsel relative to his ultimate or resultant opinion as to whether or not the defendant had on November the 11th a condition which could be considered one of mental defect or disease. And in giving his answer he coupled that with the term that he did have—he did find that this man had a mental disease or defect and/or an amphetamine psychosis. Now, by giving this instruction at this time, I only wish to inform the jury as to what their responsibility is to consider from this type of testimony and

Kolisnitschenko asserts that the portion of the instruction regarding voluntary intoxication was erroneous. He argues that where voluntary intoxication and a preexisting mental disorder interact to cause a mental disease, the voluntariness of the intoxication is irrelevant and will not defeat an insanity defense.

The instruction to which Kolisnitschenko objects was based on language from *Gibson v. State*, 55 Wis.2d 110, 115–116, 197 N.W.2d 813 (1972). Gibson claimed he was insane when he killed his sister-in-law as a result of taking two amphetamines and drinking beer. There was no evidence that Gibson suffered from a mental disease or mental disorder prior to ingesting the amphetamines and beer. With respect to Gibson's insanity defense, we declared:

"On the issue of insanity, Drs. Johnson and Bacon both testified that in their opinion Gibson was in such a *drugged condition* at the time of the murder that he was suffering from a mental defect or disease and he was not able to conform his conduct to the requirements of the law. *We do not consider that a voluntarily drugged condition is a form of insanity which under the American Law Institute test of insanity can constitute a mental defect or a disease.*" (Emphasis added.)

what the law in Wisconsin says in reference to it. *And that is that under the ALI test it is held in Wisconsin that defendant's alleged drugged condition when it is considered a mental defect or disease which impairs his volitional ability is brought into the record, it is not to be considered by you as a test under the American Law Institute for mental disease or defect because a voluntarily drugged condition does not constitute a defect or disease under the ALI test and a lack of intent does not necessarily prove insanity.* I give you that instruction at this time so that you are aware from the doctor's testimony what the defense side of this case happens to be and also aware of what will be instructed on relative to the qualifications for making your findings when this case is turned over to you for final deliberations. . . ." (Emphasis added.)

Kolisnitschenko argues that the *Gibson* instruction should not have been given because the facts in this case are significantly distinguishable from the facts in *Gibson*. Unlike Gibson, Kolisnitschenko claims he suffered from a mental disorder prior to the night of the murder. Dr. Crowley and Dr. Liccione testified that Kolisnitschenko was predisposed to the development of the psychosis from which he suffered at the time of the murder because he had a "stormy personality." Stormy personality, regarded as a mental disorder rather than a mental disease, is a non-temporary pre-psychotic condition. While an individual suffering from this disorder can behave normally while under only minimal stress, any unexpected moderate to moderately severe stress could trigger a psychotic response. An individual with a stormy personality characteristically is unstable, takes drugs, has minor scrapes with the law, has a bad marriage, performs unsatisfactorily at work and adjusts poorly to school. Dr. Fai, a psychiatrist who testified for the State, was unfamiliar with the concept of the stormy personality. He regarded Kolisnitschenko simply as a drug abuser.

The medical evidence indicated that Kolisnitschenko was not psychotic prior to the night of the murder. Nevertheless, according to Dr. Crowley, Kolisnitschenko's condition at the time of the murder was not merely an acute intoxicated state. According to Dr. Crowley and Dr. Liccione, Kolisnitschenko's stormy personality, the drugs he had taken, and his reaction to having been sexually abstinent for several months interacted to produce a temporary psychosis with which Kolisnitschenko was afflicted at the time of the murder. The testimony regarding lack of sexual activity was conclusory and, on the record as a whole, it appeared a much less significant factor than the drug ingestion.

Kolisnitschenko was no longer psychotic when Dr. Crowley first interviewed him two months after the

murder. The medical evidence suggested that Kolisnit-schenko's phychosis had tapered off substantially by the morning following the murder although it was still present in some degree.

The insanity defense prevents imposition of punishment on an individual who lacks the mental capacity to obey the law.[3] The law recognizes that it is inappropriate to hold one criminally accountable for behavior not within one's control.

The rule that a defendant who is legally insane will be relieved of criminal liability must be reconciled with the generally accepted rule that a defendant who is voluntarily under the influence of intoxicants (alcohol and other drugs) at the time of the crime will not be relieved of criminal responsibility.[4] *Gibson v. State,* 55 Wis.2d

---

[3] The following observation was made in the commentary on the American Law Institute's Model Penal Code, sec. 4.01:

"No problem in the drafting of a penal code presents larger intrinsic difficulty than that of determining when individuals whose conduct would otherwise be criminal ought to be exculpated on the ground that they were suffering from mental disease or defect when they acted as they did. What is involved specifically is the drawing of a line between the use of public agencies and public force to condemn the offender by conviction, with resultant sanctions in which there is inescapably a punitive ingredient (however constructive we may attempt to make the process of correction) and modes of disposition in which that ingredient is absent, even though restraint may be involved. To put the matter differently, the problem is to discriminate between the cases where a punitive-correctional disposition is appropriate and those in which a medical-custodial disposition is the only kind that the law should allow." Tentative Draft No. 4, p. 156 (1955). *See* Note, *Criminal Law—Insanity Defense—Wisconsin Court's Partial Acceptance of A.L.I. Definition Spotlights Difficulty of Reconciling Competing Policy Goals,* 28 Ohio State L.J. 509, 510 (1967).

[4] Sec. 939.42(1), Stats., provides:

"An intoxicated or a drugged condition of the actor is a defense only if such condition:

110, 114, 197 N.W.2d 813 (1972) ; *Loveday v. State,* 74 Wis.2d 503, 514, 247 N.W.2d 116, (1976). The voluntary intoxication rule has been justified on both doctrinal and policy grounds. One who intentionally consumes drugs should be held to have intended all the consequences of the resulting intoxicated condition. Accepting intoxication as a defense would allow criminals to feign intoxication or to resort deliberately to intoxication as a shield against liability.[5] Challenges to the doctrinal and policy bases for the rule have been raised, but no other viable approach to the problem has yet emerged.

Asking us to adopt an exception to the general rule regarding voluntary intoxication,[6] Kolisnitschenko urges the court to hold that a temporary psychosis which re-

"(1) Is involuntarily produced and renders the actor incapable of distinguishing between right and wrong in regard to the alleged criminal act at the time the act is committed; . . ."

[5] *See generally,* Halls, *General Principles of Criminal Law CXIV* (2d ed. 1960) ; Lunter, *The Effect of Drug-Induced Intoxication on the Issue of Criminal Responsibility,* 8 Crim. Law Bull. 731 (1972) ; Annot., *Voluntary Drug Intoxication as Defense,* 73 ALR3d 104 (1976) ; Annot., *Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge,* 8 ALR3d 1236 (1976); *State v. Arsenault,* 152 Me. 121, 124 A.2d 741 (1956) ; *Kendall v. State,* 244 Miss. 618, 145 So.2d 924, 925 (1962) ; *Pierce v. Turner,* 276 F. Supp. 289, 300 (D. Utah 1967), *aff'd* 402 F.2d 109 (10th Cir. 1968), *cert. denied* 394 U.S. 950.

[6] The broadly stated rule of voluntary intoxication has been embellished with exceptions. For example, Wisconsin recognizes that voluntary drunkenness may be a defense if it precludes formation of a "specific intent" necessary to the completion of a particular offense.

Sec. 939.42(2), Stats., provides:

"An intoxicated or a drugged condition of the actor is a defense only if such condition:

". . .

"(2) Negatives the existence of a state of mind essential to the crime."

*See also Gibson v. State,* 55 Wis.2d 110, 114, 197 N.W.2d 813 (1972).

sults from the interaction of voluntary intoxication and an underlying mental disorder constitutes a defense to a criminal charge. Kolisnitschenko relies on *State v. Maik*, 60 N.J. 203, 287 A.2d 715 (1972) to support the rule he proposes. In *Maik* the New Jersey Supreme Court held that the trial court erred in charging the jury that the insanity defense was not available if the psychosis was triggered by Maik's voluntary use of drugs.

Kolisnitschenko interprets *Maik* as holding that where a psychosis has emerged from an underlying mental disorder, a court should disregard the nature of the precipitating event. We do not agree with Kolisnitschenko's interpretation; the court in *Maik* did not adopt this broad a rule applicable to all cases. Indeed it is obvious from the opinion that the New Jersey court evaluates the relation between the insanity defense and the voluntary intoxication rule on a case-by-case basis, giving consideration to the concept of individual responsibility and the need to protect the public from harm. The court set forth its rationale of drawing the line between the mentally ill (the sick) and the criminal (the "bad") as follows:

"The point to be stressed is that in drawing a line between the sick and the bad, there is no purpose to subject others to harm at the hands of the mentally ill. On the contrary, the aim of the law is to protect the innocent from injury by the sick as well as the bad. The distinction bears only upon whether the stigma of criminal shall be imposed and upon the measures to be employed to guard against further transgressions. Thus our statute, N.J.S.A. 2A:163-3 directs that a defendant acquitted because of insanity shall be held in custody until 'restored to reason.' Indeed, an offender may fare better as bad than as sick, for, if merely bad, his maximum term may be limited even though his disposition for badness may continue, whereas, if he is adjudged sick, he may be confined for his remaining years.

"It is in this context that we must decide whether the voluntary use of drugs should support a defense of insanity in the circumstances of this case, and if so, what change in the offender's basic personality makeup should be found before he is released from the grip needed to protect others from a repetition of the behavior thus attributed to sickness rather than badness." *State v. Maik,* 60 N.J. 203, 287 A.2d 715, 720 (1972).

The facts of *Maik* differ substantially from those of the case at bar. Maik stabbed and killed a college classmate. The psychiatrists who testified at his trial agreed that the murder was committed during a psychotic episode, "a true schizophrenic break." They described Maik as having "an underlying condition, of long duration, which led to a break from reality when he was subjected to some stress he could not handle." His family had a history of paranoid schizophrenia and his family life was described as "unusually unfortunate." Two months before the murder, Maik had taken LSD twice, and from that time until the murder he smoked hashish once a week. He had been diagnosed as psychotic two days before the murder and was not under the direct influence of any drug at the time of the murder. The psychiatrists were uncertain whether the psychotic episode during which Maik committed the crime was triggered by his drug use or by some other stress.

Maik remained violent after the murder and was committed to the state hospital. He received medication and shock treatments and, after several months, was found to be "in remission" and able to stand trial.

In contrast, Kolisnitschenko was psychotic only during the period of intoxication. There was no evidence that Kolisnitschenko's mental disease existed before consuming the intoxicants or persisted after the effects of the intoxicants had worn off.[7] There was no evidence that

[7] The State urges this court to adopt the rule set forth in *People v. Kelly,* 10 Cal.3d 565, 111 Cal. Reptr. 171, 516 P.2d 875

Kolisnitschenko's mental disorder increased his suscepti-
bility to drugs. Kolisnitschenko apparently was able to
function in society despite his stormy personality.

Doctors Crowley and Liccione agreed that the events
which triggered Kolisnitschenko's psychotic reaction
were consumption of the drugs and lack of sexual activity.
The significance of the sexual inactivity absent drug con-
sumption is not established on the record. In any event,
the evidence clearly demonstrates that intoxication was
a significant precipitating factor, thus distinguishing the
situation from that in *Maik* where the testimony was that
intoxication was one possible precipitating factor among
various possibilities.

Doctors Liccione and Crowley testify that a comparable
psychosis could have been triggered in Kolisnitschenko
by factors other than drug consumption and sexual in-

(1973), namely that temporary insanity caused by the interaction
of a preexisting mental disorder with intoxicants voluntarily
consumed is not a defense to criminal conduct unless the resulting
insanity is of a settled nature, that is, persisting after the im-
mediate effects of the intoxicants have worn off. The facts of
this case do not require that we consider the adoption of this rule.

The State's brief views the instruction given as correct under
the facts of this case but as possibly ambiguous or erroneous if
given in a different fact situation:

"Admittedly, the instruction given by the trial court at the
close of testimony was somewhat ambiguous insofar as it indicated
that a person who becomes insane through chronic drug or alcohol
intoxication is not suffering from a mental disease recognized by
law. The court could have clarified this instruction by inserting
the word 'unsettled' before the term 'mental disease' at the
beginning of the instruction. Or the court could have added the
phrase 'unless the insanity persists after the effects of the intoxi-
cants have worn off' at the end of the instruction. Despite this
shortcoming, the instruction was not erroneous given the facts
in the case.

". . . Under the facts in this case, the trial court's instruction
was not erroneous even though it would be incorrect in situations
where the accused suffered from settled insanity caused by volun-
tary drug or alcohol intoxication."

activity, *i.e.*, any unexpected moderate to moderately severe stress such as being confronted by someone with a markely different lifestyle, being caught in an elevator, or being deprived of human contact for a few days. There was no evidence that Kolisnitschenko had ever experienced psychotic episodes which were triggered by these factors. The possibility of a psychosis being triggered by an event not within Kolisnitschenko's control does not alter the fact that he had control over the drug consumption which in fact triggered the psychotic episode during which the crime was committed. Kolisnitschenko may fairly be held responsible for his actions while he was intoxicated and temporarily psychotic because individual volition played a major part in producing that condition. Accordingly, we are not willing to hold in this case that a temporary psychotic state which lasts only for the period of intoxication and which is brought into existence by the interaction of a stormy personality and voluntary intoxication constitutes a mental disease which is a defense to the crime charged.

Under the facts of this case the jury instruction on criminal responsibility and voluntary intoxication was not erroneous.[8] That Kolisnitschenko's preexisting stormy personality was an ingredient in his mental disease does not render the *Gibson* instruction erroneous.

*By the Court.*—Judgment affirmed.

[8] In *Terrill v. The State*, 74 Wis. 278, 42 N.W. 243 (1889), the defendant pleaded not guilty to a charge of murder by reason of insanity. This court held that the trial court had erred in instructing the jury that insanity was not a defense if voluntary intoxication were even a remote cause of the insanity. There is little factual information given in the *Terrill* decision. However, it appears Terrill had a head injury as a child, had been drinking heavily immediately before the shooting and was a heavy drinker on numerous occasions. The opinion does not state whether Terrill's insanity existed prior to the incident in question or persisted after the period of intoxication. It is therefore unclear whether the *Terrill* case conflicts with the holding of this case. To the extent *Terrill* may be viewed as inconsistent, it is overruled.