# STATE of Wisconsin, Plaintiff-Respondent,

v.

# Charles C. COOGAN, Defendant-Appellant.†

## Court of Appeals

*No. 89-0923-CR. Orally argued December 5, 1989.—Decided January 17, 1990.*

(Also reported in 453 N.W.2d 186.)

†Petition to review denied.

For defendant-appellant there were briefs submitted by an oral argument by *Michael Tobin,* assistant state public defender.

For plaintiff-respondent there was a brief submitted by *Donald J. Hanaway,* attorney general, and *James M. Freimuth,* assistant attorney general, and oral argument by *James M. Freimuth.*

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. Charles Coogan appeals a conviction on two counts of first-degree murder and an order denying a new trial. Coogan was convicted of killing two men during a 1979 robbery of a Chippewa County bar. He claimed at trial to remember little or nothing of the incident. While in prison, Coogan underwent psycho-

therapy. He now presents evidence, brought out under hypnosis, that at the time of the killings he was having flashbacks and believed he was in a combat situation in Vietnam. He also seeks to present expert testimony diagnosing his condition as post-traumatic stress disorder (PTSD) and lay testimony describing his behavior conforming to that diagnosis.

As further grounds for a new trial, he alleges ineffective assistance of counsel during his trial and, alternatively, asks that a new trial be granted in the interest of justice. The trial court refused Coogan's request for a new trial based primarily on findings that the hypnotically-refreshed testimony was so unreliable it was inadmissible, and also that there was not a reasonable probability that a new trial would reach a different result. We affirm the trial court's decision.

Coogan is an Army veteran who spent eighteen months as a combat engineer in Vietnam. Ten years after his discharge, on April 20, 1979, he fatally shot two men in the Four Corners Tavern in the town of Eagle Point.

The state presented a great deal of evidence during the trial that showed Coogan was in the process of robbing the tavern when he killed the men. Several witnesses present at the scene testified that Coogan entered the tavern, pointed a gun at the bartender and demanded money. After the bartender told Coogan to get the money himself, Coogan shot him in the chest and began to rifle through the cash register. A patron moved, and Coogan shot him also. Coogan told the customers that he did not wish to harm anyone; he only wanted the money. Before fleeing the bar, Coogan warned the remaining individuals that his armed accomplice was waiting outside and that no one was to exit the bar for ten minutes.

Coogan drove to the Lounge Bar. However, a bystander followed him and relayed his location to the police. At the Lounge Bar, Coogan remarked to a customer that he had heard on the police scanner while on the way home from work that there had been two people shot at the Four Corners. It is undisputed that Coogan did not possess a scanner and had not been at work that day. When police arrested him, they found on his person $272.28 in cash, of which $13.28 was in coins, and a bank slip bearing the name of the murdered bar patron. They also tested Coogan and found a blood alcohol content of .21%. Coogan claimed to have no memory of the events at the Four Corners.

Before trial, Coogan was evaluated by two psychiatrists. Dr. Leigh Roberts found that Coogan suffered from a borderline personality organization that, when combined with alcohol consumption, had produced a "mini-psychosis," which had substantially reduced his ability to form any sort of intent. Dr. Darold Treffert found that Coogan had suffered a blackout as a result of voluntary intoxication and also described Coogan as having a "paranoid" personality. Both doctors believed that, absent the intoxication, Coogan could conform his conduct to the law.

The jury found Coogan guilty of two counts of first-degree murder and two counts of armed robbery. His trial counsel determined that the psychiatric evidence available did not constitute a legal defense and elected not to present evidence during the responsibility phase of the trial. The jury found that Coogan was sane at the time of his crimes. The trial court gave Coogan consecutive life sentences on the murder charges and two ten-year sentences, concurrent with each other and consecutive to the murder sentences, for the robbery. The convictions were affirmed by this court on direct appeal.

*State v. Coogan*, No. 80–1314–CR, unpublished slip op. (Wis. Ct. App. July 28, 1981).

While in prison, Coogan began therapy with Dr. Richard Arnesen, a prison psychiatrist who was familiar with Coogan from a prior incarceration. Based on Coogan's account of the killings and descriptions of some of his wartime experiences, Arnesen concluded that Coogan suffered from PTSD. Arnesen conducted numerous hypnotic sessions with Coogan. During these sessions, Coogan related a version of events that, if believed, demonstrated he was suffering a dissociative flashback episode to his Vietnam experiences at the time of the killings. He perceived himself as searching a suspected enemy hut in Vietnam looking for Viet Cong guerillas or documents, rather than robbing the tavern. Arnesen presented his evidence to other psychiatrists, most notably Dr. Gary Palmer, an expert on the subject of PTSD in Vietnam-era veterans. They concurred in his diagnosis.

Coogan sought a new trial based primarily on the new diagnosis and hypnotically-refreshed recollection. In addition to the psychiatric testimony, Coogan also presented evidence of unusual behavior following his service in Vietnam. Particularly, he presented evidence that on the day of the killings he had inexplicably shot at a swimming dog, talked about his Vietnam experiences, and even spoke Vietnamese at the Lounge Bar.

## I. NEWLY-DISCOVERED EVIDENCE

Due process requires a new trial if the defendant satisfies the following criteria: (1) the evidence was discovered after trial; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue; (4) the evidence is not merely cumulative to the evidence presented at trial; and (5) a reasonable probability exists

of a different result in a new trial. *State v. Bembenek,* 140 Wis. 2d 248, 252, 409 N.W.2d 432, 434 (Ct. App. 1987). The same criteria apply to a request for a new mental responsibility proceeding on the basis of newly-discovered evidence. *Vara v. State,* 56 Wis. 2d 390, 393-94, 202 N.W.2d 10, 12 (1972).

The defendant must establish his right to a new trial by clear and convincing evidence under sec. 974.06, Stats. *Bembenek,* 140 Wis. 2d at 252-53, 409 N.W.2d at 434. Whether due process warrants retrial is a constitutional question subject to de novo review. *Id.* at 252, 409 N.W.2d at 434.[1]

The United States Supreme Court has ruled that a state cannot have a per se rule barring a defendant from giving hypnotically-refreshed testimony. *Rock v. Arkansas,* 483 U.S. 44, 61 (1987). Instead, Wisconsin has a list of nine criteria a court should consider before ruling on the admissibility of hypnotically-induced evidence. *State v. Armstrong,* 110 Wis. 2d 555, 571-72 n.23, 329 N.W.2d 386, 394-95 n.23, *cert. denied,* 461 U.S. 946 (1983).[2]

---

[1]*See also State v. Herfel,* 49 Wis. 2d 513, 521, 182 N.W.2d 232, 237 (1971), which holds that when the original trial and the new trial motion are before different judges, a motion for a new trial on the basis of newly-discovered evidence is subject to de novo review on appeal.

[2]The *Armstrong* criteria are:

1. The person administering the hypnotic session ought to be a mental health person with special training in the use of hypnosis, preferably a psychiatrist or a psychologist.

2. This specially trained person should not be informed about the case verbally. Rather, such person should receive a written memorandum outlining whatever facts are necessary to know. Care should be exercised to avoid any communication that might influence the person's opinion.

Although *Armstrong* concerned the hypnotic recollection of a prosecution witness, there is nothing in the opinion to indicate that one should measure the reliability of a defendant's proposed testimony in a different manner.

In this case, the trial court carefully went through the *Armstrong* guidelines and concluded that Coogan's proposed testimony was inadmissible.[3] Traditionally, the trial court has broad discretion in this area. *See State v. Wurtz*, 141 Wis. 2d 795, 416 N.W.2d 623 (Ct. App. 1987)

---

3. Said specially trained person should be an independent professional not responsible to the prosecution, investigators or the defense.

4. All contact between the specially trained person and the subject should be videotaped from beginning to end.

5. Nobody representing the police or the prosecutor or the defendant should be in the same room with the specially trained person while he is working with the subject.

6. Prior to induction a mental health professional should examine the subject to exclude the possibility that the subject is physically or mentally ill and to confirm that the subject possesses sufficient judgment, intelligence, and reason to comprehend what is happening.

7. The specially trained person should elicit a detailed description of the facts as the subject believes them to be prior to the use of hypnosis.

8. The specially trained person should strive to avoid adding any new elements to the subject's description of her/his experience, including any implicit or explicit cues during the pre-session contact, the actual hypnosis and the post-session contact.

9. Consideration should be given to any other evidence tending to corroborate or challenge the information garnered during the trance or as a result of post-hypnotic suggestion . . ..

*Id.* at 571-72 n.23, 329 N.W.2d at 394-95 n.23.

[3] The trial court concluded that because the evidence was not admissible, it was immaterial. *Bembenek* states that inadmissibility goes instead to the fifth factor of whether a different result would be reached. *Id.* at 256-57, 409 N.W.2d at 435-36.

(allowing trial court to hold hypnotically-induced testimony inadmissible, when the court had ruled such testimony admissible, without error, prior to remand). Even though the grant of a new trial is a constitutional question, the admissibility of proposed evidence, unless based on an error of law, remains a discretionary decision of the trial court. *See Bembenek,* 140 Wis. 2d at 255-56, 409 N.W.2d at 435.

■ Coogan argues that the trial court abused its discretion by improperly weighing the *Armstrong* criteria. Specifically, he argues that it overemphasized the ninth factor by placing too much emphasis on whether the hypnotically-refreshed testimony agreed with the other evidence and was internally consistent. *Armstrong* states:

> The above are merely guidelines, not imperatives; others could be equally helpful. If the state complies with these or similar guidelines, the trial judge's task of assessing the presence of suggestiveness in the hypnotic session would be facilitated. However, compliance with the guidelines does not guarantee that the hypnotized witness' testimony will be admitted. Nor does the failure to comply with the guidelines require exclusion. The central inquiry remains whether, as a result of events occurring during the hypnosis session, any subsequent statements made by the hypnotized subject should be considered so unreliable as not to be admissible at trial.

*Id.* at 571-72 n.23, 329 N.W.2d at 394-95 n.23. *Armstrong* allows the trial court broad discretion in what to consider when determining the admissibility of hypnotically-refreshed testimony. In this case, the court found that there were a number of problems with the proposed testimony including the use of suggestive and leading

questions during hypnosis and the attendance of defense counsel at one of the sessions. It also gave great weight to the nonconformity of the proposed testimony with the other evidence in the case. The trial court did not abuse its discretion in weighing these factors and concluding that the hypnotically-refreshed testimony was inadmissible.

Even in the absence of hypnotically-refreshed testimony, Coogan wishes to present expert testimony that he was suffering from PTSD at the time of the crime. The trial court held that without the hypnotically-refreshed testimony, there would be nothing on which the experts could base their opinions. Additionally, it ruled that a new trial would not produce a different result. While we use a somewhat different analysis, we reach the same conclusion.

The diagnosis that Coogan suffers from PTSD was not presented at the trial and is clearly new evidence. The issue is whether the diagnosis satisfies *Bembenek's* five criteria for a new trial.

We have upheld the trial court's discretionary determination that Coogan's hypnotically-refreshed testimony is inadmissible. However, the PTSD diagnosis is not based solely on the hypnotically-refreshed testimony. In fact, Dr. Arnesen made the diagnosis prior to commencing any hypnotic therapy with Coogan. The diagnosis was originally based on an analysis of Coogan's behavior, discussion of his wartime experiences, and a widespread acceptance of the existence of the disorder in the psychiatric profession as evidenced by its inclusion in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM III) (3d ed. 1980), published by the American Psychiatric Association.

Section 907.03, Stats., provides:

Bases of opinion testimony by experts. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

For the purpose of this opinion, we assume without deciding that the type of sessions Dr. Arnesen conducted with Coogan are reasonably relied on by psychiatrists in reaching a diagnosis or other opinion. This being the case, the diagnosis itself is admissible into evidence under sec. 907.03, despite the fact that the expert relied, in part, on evidence that is legally inadmissible.[4]

It is a separate question, however, whether the expert, in addition to voicing his opinion, may act as a conduit for inadmissible evidence. We hold he may not. In discussing sec. 907.03, Stats., our supreme court has said:

> [The underlying inadmissible] facts relied on by the expert may be admitted for the limited purpose of impeachment and verbal clarity. If a party's expert relies on certain data, "fair play" requires that the opponent may show that the data relied on did not

---

[4]We need not reach the question of whether an expert's opinion based solely on inadmissible evidence, but that of a type reasonably relied on in his field, is admissible. However, this court has suggested that at some point when the reliability of the underlying evidence is called seriously into question, it is permissible to bar the expert's testimony. *See B.A.C. v. T.L.G.,* 135 Wis. 2d 280, 288, 400 N.W.2d 48, 52–53 (Ct. App. 1986) (expert opinion based solely on blood tests is inadmissible unless evidentiary foundation for tests exists).

support the conclusions of the testifying expert, or that the data relied on contained information ignored by the testifying expert . . ..*Vinicky* permits admission of the report by the party adverse to the witness.

*Karl v. Employers Ins.,* 78 Wis. 2d 284, 300, 254 N.W.2d 255, 262 (1977) (citing *Vinicky v. Midland Mut. Cas. Ins. Co.,* 35 Wis. 2d 246, 255, 151 N.W.2d 77, 82–83 (1967)).[5] Applying this standard to the facts of this case, the psychiatric experts' opinions are admissible into evidence. However, the underlying factual basis for those opinions, to the extent that it is inadmissible hypnotically-refreshed testimony, is not admissible, unless the state opens the door by cross-examining the experts on the unreliability of the facts underlying their opinion.

Coogan also argues that his statements to Dr. Arnesen while under hypnosis are admissible under sec. 908.03(4), Stats., the hearsay exception for statements made for medical diagnosis or treatment.[6] It is not clear what form the proposed testimony may take. It is possi-

---

[5]*See also Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261 (7th Cir. 1988). In *Nachtsheim,* a case arising out of Wisconsin, the court was asked to interpret Federal Rule of Evidence 703, which contains language identical to that of sec. 907.03, Stats. The court held that an expert could testify as to the cause of a plane accident but that he could not reveal one of the factual bases for his opinion if it was not independently admissible. *Nachtsheim,* 847 F.2d at 1270–71.

[6]Section 908.03(4), states:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . ..

(4) Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

ble that Coogan would testify based on his hypnotically-refreshed memory, that Dr. Arnesen, or another expert, would testify as to Coogan's remarks or behavior under hypnosis, that some form of tape or recording of previous hypnosis sessions would be offered, or that some combination of the above would be presented. There has not yet been any hearsay objection to this proposed testimony. The testimony was barred instead because the trial court determined, based on the *Armstrong* criteria, that the testimony was too unreliable to be admitted. The hearsay exception has no applicability to this ruling.

Although we believe the diagnosis itself to be admissible, we are not satisfied that it meets the *Bembenek* criteria for a new trial. Specifically, we agree with the trial court that a different result is not a reasonable probability in light of this new evidence. In particular, we note the numerous eyewitness accounts of the killings. On at least three occasions, Coogan made remarks indicating that this was a robbery. He said nothing that any patron associated with Vietnam, and witnesses specifically deny that Coogan ever spoke in a foreign language. While at the second tavern, Coogan remarked that he had heard that a robbery had occurred at the Four Corners, a statement he could have only made from personal knowledge. Additionally, he attempted to get rid of his holster when police arrived.

Coogan argues that the failure of witnesses to notice bizarre behavior does not refute the PTSD flashback theory. Dr. Palmer testified that Coogan may have been "in and out" of the flashback during the robbery and killings, and that a flashback cannot always be identified by outwardly manifested behavior.

Without disagreeing with Palmer's analysis, we note much of Coogan's evidence of PTSD is outwardly manifested behavior. Moreover, the witnesses described more

401

than the absence of bizarre behavior; they described words and actions that only make sense in the context of a robbery. Additionally, Dr. Treffert testified that Coogan was not suffering from a flashback during the killings.

As set out in *Bembenek,* Coogan must demonstrate by clear and convincing evidence that the new evidence offers a reasonable probability of a different result upon retrial. While the diagnosis of PTSD is amply supported by evidence, that same evidence does not sufficiently support the claim that Coogan was in the midst of a flashback during the killings. Anyone, expert or not, who forms an opinion as to the mental state of another individual can generally rely on two factors: observation of behavior and communication with the individual. (There may be odd cases, such as those involving identifiable organic brain damage, where this proposition does not hold true.) Most of Coogan's behavior did not conform to the flashback theory. Additionally, Coogan's hypnotically-refreshed recollections were deemed so unreliable that they are not admissible in court.

Were this merely a matter of presenting some facts or inferences in favor of Coogan's position, he would have met his burden. However, based on the totality of the evidence before us, we uphold the trial court's determination that Coogan has failed to demonstrate by clear and convincing evidence a reasonable likelihood that a jury would absolve him of guilt or responsibility for the crime based on a diagnosis of PTSD.

Next, Coogan presents this court with lay testimony describing his behavior that conforms with the PTSD diagnosis. The lay testimony is largely descriptions of Coogan's unusual behavior following his return from

Vietnam. The testimony was available at the time of the trial, although Coogan had not thought of the evidence within the PTSD framework. "[N]ewly discovered evidence does not include newly discovered importance of evidence previously known and not used." *Vara,* 56 Wis. 2d at 394, 202 N.W.2d at 12. The PTSD diagnosis does not make the lay testimony about Coogan's erratic behavior new evidence. It only provides another manner to look at evidence that was known at the time of trial, or could have easily been discovered.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

To establish a violation of his constitutional right to the effective assistance of counsel, Coogan must show (1) that counsel's representation was deficient; and (2) that the deficient representation resulted in prejudice. *State v. Pitsch,* 124 Wis. 2d 628, 633, 369 N.W.2d 711, 714 (1985). While there are many disputed facts in this case, the facts surrounding trial counsel's failure to present evidence in the responsibility phase are not disputed. If the material facts are undisputed, this raises a question of law that we review de novo. *Id.* at 634, 369 N.W.2d at 715.

There is an initial question as to whether Coogan "knowingly, voluntarily and intelligently" waived his right to effective assistance of counsel when he failed to argue it in his initial appeal. *See* sec. 974.06(4), Stats. We hold that his actions do not adequately constitute waiver. Section 974.06 is intended to reach constitutional and jurisdictional issues that were not raised in the original trial. It would defeat the statute's purpose if failure to raise those issues on direct appeal alone consti-

tuted a "knowing, voluntary and intelligent waiver." We therefore examine the merits of Coogan's argument.

The merits of the ineffective assistance of counsel claim involve the failure of Coogan's trial attorney to present any evidence at the responsibility phase of the trial. Dr. Roberts was prepared to testify that he diagnosed Coogan as having a "very severe personality disorder," which, when combined with his alcohol consumption, brought about a mini-psychosis during which he could not control his impulses. Roberts and trial counsel both believed that the supreme court's holding in *State v. Kolisnitschenko,* 84 Wis. 2d 492, 267 N.W.2d 321 (1978), barred Roberts' testimony. After conferring with Coogan, he elected not to present it.

*Kolisnitschenko* concerns the voluntary intoxication rule. Read broadly, it prohibits testimony, during the responsibility phase, that the defendant had a mental disorder if the psychotic episode itself was triggered by voluntary intoxication. *Id.* at 503, 267 N.W.2d at 326. Roberts stated that Coogan, when sober, was able to conform his conduct to the law.

In *Kolisnitschenko,* there was no evidence to suggest that any mental disease existed before the defendant consumed the intoxicants or persisted after its effects had worn off. *Id.* at 501, 267 N.W.2d at 325. In this case, Roberts stated that the alcohol use did not cause the mental condition, but merely aggravated the symptoms. Coogan had previously been diagnosed as exhibiting paranoid traits, borderline psychosis and schizophrenia.

It is a close question whether *Kolisnitschenko* would have legally barred Roberts' testimony during the responsibility phase. Under cases decided after the original trial, the testimony is probably legally admissible. *See State v. Repp,* 122 Wis. 2d 246, 260–61, 362 N.W.2d 415, 421 (1985) ("*Kolisnitschenko* does not prohibit the

introduction of psychiatric opinion evidence as to the effects of intoxication and mental disorder.").

However, the question before us is not whether trial counsel correctly interpreted *Kolisnitschenko*. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 688 (1984). Trial counsel examined the applicable law and reached a reasonable conclusion, a conclusion that was also reached by Roberts himself and the trial court in the new trial motion. In 1979, the case law was less fully developed than it is today. Additionally, Roberts' diagnosis of a "borderline personality" is much closer to the "stormy personality" of the defendant in *Kolisnitschenko* than is the current diagnosis of PTSD. Given these facts, and the fact that the decision not to present testimony was discussed with Coogan and Roberts, we agree with the trial court that counsel's performance was not deficient.

The issue of prejudice also favors the state. Most of Roberts' testimony was put before the jury during the guilt phase of the trial. In light of all the evidence supporting the state's case and of Roberts' statement that, in the absence of alcohol, Coogan could have conformed his conduct to the law, there is no prejudice. Testimony concerning Coogan's borderline personality would not have affected the result.

### III. NEW TRIAL IN THE INTEREST OF JUSTICE

Finally, Coogan asks for a new trial in the interest of justice. That is a discretionary decision by this court. *State v. Penigar,* 139 Wis. 2d 569, 577–78, 408 N.W.2d 28, 32 (1987). Based on the evidence presented at the

original trial and at the hearing on the motion for a new trial, we believe there is minimal likelihood that a new trial would produce a different result. Accordingly, we affirm the denial of a new trial.

*By the Court.*—Judgment and order affirmed.