VINICKY and another, Respondents, v. MIDLAND MUTUAL CASUALTY INSURANCE COMPANY, Appellant.

*May 8—June 6, 1967.*

For the appellant there was a brief by *Allan & Storck* of Mayville, and oral argument by *Robert E. Storck*.

For the respondents there was a brief by *Vaughn S. Conway* and *Kenneth H. Conway,* and oral argument by *Kenneth H. Conway, Jr.,* all of Baraboo.

HEFFERNAN, J.

*Were the damages awarded to Smaha excessive?*

The trial judge found that the damages were not excessive. We have previously held that:

"The trial judge has an advantage over the appellate court in that he not only sees and hears the testimony, which we can only read from the transcript, but he also has the same opportunity to observe the injured person as does the jury." *Makowski v. Ehlenbach* (1960), 11 Wis. (2d) 38, 43, 103 N. W. (2d) 907.

In the recent case of *Bentzler v. Braun* (1967), 34 Wis. (2d) 362, 389, 149 N. W. (2d) 626, we quoted with approval the statement appearing in *Ballard v. Lumbermen's Mut. Casualty Co.* (1967), 33 Wis. (2d) 601, 606, 148 N. W. (2d) 65: "'. . . we have repeatedly said that this court will view with particular favor a verdict that has the trial judge's approval.'"

In *Kablitz v. Hoeft* (1964), 25 Wis. (2d) 518, 525, 131 N. W. (2d) 346, we stated:

"A damage verdict which has been approved by the trial court will not be disturbed if 'there exists a reasonable basis for the trial court's determination after resolving any direct conflicts in the testimony in favor of plaintiff.'" [Citing authority.]

Upon a review of the evidence relating to Smaha's personal injuries, and applying the standards outlined above,

we conclude that there is a "reasonable basis" for concluding that the damages are not excessive.

Smaha testified that he was unable to recall anything from prior to the accident until he woke up in the hospital with pain in his chest and in the vicinity of the right ear. His son, Tony Jr., testified, as did one Hough, an occupant of a following vehicle, that Smaha was rendered unconscious. Dr. Otto Pawlisch, the attending physician, gave as his opinion that Smaha suffered a concussion and the force of the blow rendered him unconscious. The evidence is overwhelming that Smaha was unconscious for at least a short period of time.

Smaha testified that his dizziness persisted and has continued intermittently up to the time of the trial. He stated that shortly after the accident he was unable to drive an automobile without veering off to the right. His wife confirmed this testimony. There is evidence that Smaha is one of the luminaries of the world of circus entertainment, and the record is replete with exhibits and show billings evidencing his prominent place in the circus world. He has testified, and there is competent supporting testimony to show, that since the accident he has suffered dizzy spells, has a less sure sense of balance, has a less sure "seat" when performing with horses. One of his more sensational stunts was the "Capriole"—an act in which he was able to induce a horse to leap into the air with all four legs extended. Prior to the accident he was able to perform this feat without help, and he now requires two assistants.

Before the accident he was able to flick a cigarette from his wife's mouth with an 18-foot-kangaroo-hide bull whip. He testified that, after the accident, in attempting this he "never was sure where the lash landed . . . [and] I cut up my wife." He wisely has discontinued this stunt. He testified that he no longer has the patience to train animals, and his wife has so testified also. Other circus

performers testified that his animals do not appear to be as well trained as before. He has also given up certain riding feats. One of these is the backward canter. On one occasion he felt dizzy, lost control of his horse, and he and his horse fell. In general since the accident "things are different." There is substantial evidence that following the accident Smaha lost his flair for showmanship. His wife stated that prior to the accident his showmanship was really something, but after the accident, "He loses this." Anthony Claude Robert Fossett, another circus performer, stated, "I find a difference in his animals and in Tony Smaha himself." He remarked that Smaha's showmanship "wasn't as good as it was before." He is more "moody" and no longer laughs and jokes.

Mrs. Smaha testified that Tony used to be "sweet" but now gets irritable and complains of headaches, has lapses of memory, and cannot concentrate. She has taken over the business management of the troupe.

The medical testimony is corroborative of the evidence presented by the lay witnesses. The attending physician stated that "the dizziness is due to residuals of the accident." Dr. Bernard Schaeffer testified that the accident was a competent producing cause of the post-accident complaints of the plaintiff. He testified that, ". . . this individual through a blow to the head; lost consciousness, and that is indicative of temporary malfunction of the brain." He gave as his opinion that the disturbance of equilibrium would remain as a permanent disability. While there was evidence of arteriosclerosis, he testified that the disability resulted from the head injury sustained in the accident.

Even defense witnesses concluded that plaintiff's disability was "a post-concussion syndrome" and, though they contended that there were other contributing causes, that the blow to the head could aggravate a condition of osteoarthritis. On cross-examination the defendant's

medical witness admitted that he found a diminution of sensation on the right side of the face and body, that reflexes were irregular and unequal, that there was a decrease in hearing and pain on motion and percussion. He concluded that the plaintiff had sustained a "cranio-cerebral injury."

On the basis of this evidence it is apparent that the jury could properly conclude that the plaintiff had suffered a permanent and disabling injury that impaired his performance as a circus artist, made him less patient and successful as an animal trainer, in general impaired his ability to enjoy his personal and family life, and diminished his pride in the artistry of his profession. While $19,000 is a large sum to award for injuries when no loss of earnings was proved, this is a separate item of damages not directly related to the loss of earning capacity but equally compensable. In this instance we do not consider the sum awarded excessive, particularly in view of the fact that the trial judge reviewed the evidence and discussed comparable awards that have heretofore been approved by this court and expressly stated his approbation.

### Were the damages awarded to Tony Jr., excessive?

We agree with the trial judge that the jury's award of damages to Tony Jr., were not excessive. We follow the same standard of review in this instance as we did in affirming the determination of damages in regard to Smaha. Tony Jr., then twelve years old, was a passenger in the car and sustained some physical injuries in the accident. The side of his face was swollen and his eye was nearly shut. However, his principal claim for damages is based upon emotional injuries and mental distress that he suffered at the time of the accident and subsequent thereto.

After the accident he saw his unconscious father and unsuccessfully tried to revive him. He testified that he

thought that his father was dead. He was taken to the hospital, where he was sick to his stomach, was violent, and required physical restraint. Commencing with the first night after his release from the hospital, he has frequently had terrible dreams and nightmares. He stated:

"I feel that something is going to happen and it ain't good either. Sometimes it is bloody and messy. It's awful to get these dreams. It scares me. Most of the time I wake up to my mother. I am all wet all over. They are— I wouldn't—They are very upsetting. . . . I feel really that something is going to happen."

His mother corroborated the intensity and frequency of these dreams, that travelling now makes him nervous, and that since the accident he has had greater difficulty in concentrating on his schoolwork.

Dr. Pawlisch diagnosed his condition at the time of his confinement after the accident as a "hysterical reaction . . . with the possibility of a little brain injury." There was testimony that the accident and the injury were the cause of the present symptoms and that they were likely to persist.

There is no doubt, of course, that mental distress caused by the accident is properly compensable (see Prosser, Law of Torts (hornbook series, 3d ed.), Mental Disturbance, p. 346, sec. 55). There is ample evidence to support the judge's conclusion that Tony Jr., was emotionally injured by the trauma of the accident and that this injury persists and is both troubling and disabling. Two thousand dollars seems like a most modest sum for this injury.

*Did the admission into evidence of the reports of examining physicians who did not personally testify prejudice the defendant?*

Dr. Jules Levin, the medical witness for the defendant, on direct examination made at least 10 references to an earlier neurological examination of Smaha by Dr. Henry

Suckle. On cross-examination Dr. Levin admitted that he read from the report of Dr. Suckle in answer to certain questions propounded to him on direct examination. He also acknowledged that he had Dr. Suckle's report at the time he conducted his own examination. He also acknowledged that he had before him a medical report prepared by Dr. Eugene E. Herzberger. On the motion of the plaintiff, over the objection of defendant's counsel, the medical reports of Dr. Suckle and Dr. Herzberger were admitted into evidence.

The objection was, of course, on the ground of hearsay and the inability to cross-examine the actual authors of the medical reports. We conclude that the trial judge correctly permitted the report of Dr. Suckle to be received in evidence.

It has long been established in Wisconsin that it is proper for a physician to make a diagnosis based in part upon medical evidence of which he has no personal knowledge but which he gleaned from the reports of others. *Sundquist v. Madison Railways Co.* (1928), 197 Wis. 83, 87, 221 N. W. 392; *Leora v. Minneapolis, St. P. & S. S. M. R. Co.* (1914), 156 Wis. 386, 395, 146 N. W. 520.

In *Rupp v. Travelers Indemnity Co.* (1962), 17 Wis. (2d) 16, 20, 115 N. W. (2d) 612, we commented on the *Sundquist Case* as follows:

"Underlying this decision is the concept [that] the hospital records, although hearsay, were trustworthy as a basis for a medical conclusion because one in a position to know accepted and relied upon them in the important daily affairs of mankind."

A similar rationale for the admission of an expert's opinion based upon the reports of another is set forth in McCormick, Evidence (hornbook series), p. 33, sec. 15:

"It seems arguable that an expert in a science is presumably competent to judge of the reliability of state-

ments made to him by other investigators or technicians. He seems just as competent indeed to do this as a judge and jury are to pass upon the credibility of an ordinary witness on the stand. If the statements, then, are attested by the expert as the basis for a judgment upon which he would act in the practice of his profession, it seems that they should ordinarily be a sufficient basis even standing alone for his direct expression of professional opinion on the stand, and this argument is reinforced when the opinion is founded not only upon such reports but also in part upon the expert's firsthand observation."

In *Chapnitsky v. McClone* (1963), 20 Wis. (2d) 453, 461, 122 N. W. (2d) 400, where plaintiff's physician used hospital reports and X rays as a partial foundation for his medical opinion, we held that it was proper to admit them for the purpose of permitting defense medical experts to base their opinion testimony upon them. We said:

"The preservation of the spirit of fair play inherent in our adversary system of trying lawsuits seems to us to lead to but one conclusion: If plaintiff's medical expert has relied on hospital-record entries and X rays not in evidence in testifying to a diagnosis or medical opinion, then defendants' medical experts should be accorded the same privilege."

In the recent case of *Lewandowski v. Preferred Risk Mut. Ins. Co.* (1966), 33 Wis. (2d) 69, 77, 146 N. W. (2d) 505, this court directed itself to the problem of the propriety of introducing into evidence the letters and reports of a nontestifying doctor that were relied on by a doctor who did testify:

"It is quite obvious these letters are hearsay evidence and inadmissible unless they come within some exception to the hearsay rule. 3 Jones, Evidence (5th ed.), p. 1202, sec. 632; *Manning v. School Dist. No. 6* (1905), 124 Wis. 84, 102 N. W. 356. However, we think the rule should be that where a doctor relies on the opinion or findings of another doctor, that such opinions or findings are admis-

sible in evidence for the purpose of impeachment. If unsworn opinions or reports are relied upon by experts as trustworthy, their trustworthiness is sufficiently established to make them admissible for impeachment purposes as an exception to the hearsay rule. Such secondary opinions or reports are not immune because the witness is an expert. If he relies on such hearsay to form his opinion, the foundation of the expert opinion is admissible for impeachment purposes or to test the validity of the opinion."

We conclude that the rationale of these earlier Wisconsin cases lead inevitably to the conclusion that, whenever it becomes apparent that a medical expert relies on the reports of other physicians or experts not in evidence, those reports may in their relevant and competent portions be introduced by the adverse party into evidence for the purpose of impeachment and in the interests of verbal completeness.

Of course, the adverse party cannot thereby bring in any irrelevant, incompetent, or highly prejudicial material that may be contained in portions of the reports or material relied upon. The party objecting to the introduction of such inadmissible portions of the documents may ask the court to exercise its discretion to delete or excise the offending portions from the statements offered (see 29 Am. Jur. (2d), Evidence, p. 929, sec. 837).

In this case we conclude that the repeated references to Dr. Suckle's findings, the verbatim use of Dr. Suckle's phrases, and the admitted use that Dr. Levin made of Dr. Suckle's report made it necessary in the interests of fair play for the jury to see the balance of Dr. Suckle's report to the extent that such report was competent or relevant.

On cross-examination Dr. Levin readily admitted that he had seen and read the Herzberger report, but there was no evidence that it formed a substantial or even

partial basis for his own diagnosis. Under these circumstances, we cannot conclude that the Herzberger report should have been admitted into evidence. There was no reference to it on direct examination and no showing that Dr. Levin placed the same emphasis on it that he placed on the Suckle report. We conclude, however, that its admission was not prejudicial. A review of the matters detailed in the Herzberger report show that they are minor, and in our view inconsequential, exceptions, in regard to symptoms and complaints otherwise in evidence. While admittedly portions of the Herzberger report contain matters upon which the physician was not competent to testify, such matters were merely cumulative of similar evidence that was competently admitted (*e.g.*, dizziness would handicap Smaha as a circus performer), and, accordingly, were not prejudicial. Moreover, the defendant did not attempt to have excised the incompetent evidence after the court ruled that the reports were to be admitted.

*By the Court.*—Judgment affirmed.