Eleanor STRELECKI, Individually, and as Administratrix of the Estate of Stanley A. Strelecki, Plaintiff-Appellant, v. FIREMANS INSURANCE COMPANY OF NEWARK, Defendant-Respondent.

Supreme Court

*No. 76–188. Argued February 28, 1979.—Decided March 27, 1979.* (Also reported in 276 N.W.2d 794.)

466

For the appellant there were briefs by *Denny & Yanisch* attorneys, and *Raymond E. French,* of counsel, both of Milwaukee, and oral argument by *William Denny.*

For the respondent there was a brief by *Otjen, Philipp & Van Ert, S. C.,* of Milwaukee, and oral argument by *Wayne Van Ert.*

COFFEY, J. The appeal challenges three rulings made by the trial court during the course of a jury trial. The action was commenced by the widow of Stanley Strelecki and seeks damages for her husband's wrongful death caused when he fell in the Milwaukee home of Edward and Frances Hintz. The Hintzes had a home-owners' liability policy in full force and effect, issued by the Firemans Insurance Co. of Newark. The jury returned a verdict finding Stanley Strelecki's contributory negligence the sole cause of his death. In the answer to the questions presented in the verdict dealing with damages, the jury awarded $10,000 as a reasonable sum to compensate the widow for her pecuniary loss and $0 for her loss of society and companionship. The trial court denied the plaintiff's motions after verdict and entered judgment on the jury's verdict.

While in a tavern on the southside of Milwaukee at 9:00 a.m. on New Year's Day, 1974, the deceased met John Mullis, the brother-in-law of Frances Hintz. After conversing over a drink, the two men left the bar and were unsuccessful in attempting to start Strelecki's auto. Mullis and the deceased then proceeded to a second bar and each man consumed two more alcoholic drinks. Following a successful attempt to start Strelecki's car, the men returned to the bar for another drink. Mullis decided to visit his sister-in-law's home and without an

invitation, the deceased followed Mullis to the house. Mrs. Hintz stood on a stairway platform holding the outside door open as the men entered the house, without any apparent difficulties as they negotiated the stairs leading from the platform into the Hintz kitchen.

Strelecki sat at the kitchen table for approximately fifteen minutes before it was suggested he leave as he was falling asleep. Strelecki exited through the kitchen door closing it behind him. Moments later, the Hintzes and Mullis heard a "thump"; they left the kitchen and discovered the deceased lying unconscious at the bottom of the basement stairs.

The medical examiner determined the cause of Strelecki's death as a cerebral hemorrhage resulting from the skull fracture received in the fall. At trial, testimony was received from a pathologist that the post-mortem tests performed on the deceased indicated a bloodstream-alcohol content of .36 grams, four hundredths of a percent away from the lethal limit. Mrs. Strelecki, in trying to explain the high percentage of alcohol found in his body, stated that to her knowledge, up until 2:30 a.m. the night before the accident, her husband had not consumed any alcohol beverages. However, the deceased's widow testified that she did not see her husband retire that evening and upon her awakening the next morning, discovered that he had not slept in his bed during the night.

At trial, the deposition testimony of Dr. Peter O'Loughlin was read into the record. Dr. O'Loughlin, a psychiatrist at the Veteran's Administration Hospital in Tomah, Wisconsin, testified that since 1971 he had personally treated the deceased for alcoholism. Further, Dr. O'Loughlin, reading from the deceased's medical records, noted that he was initially admitted to the hospital in 1958. The plaintiff objected to the introduction of these records through the psychiatrist's testimony and stated as grounds for the objection that the records constituted

inadmissible hearsay evidence as the doctor had not personally prepared the records. The objection was overruled, the trial court finding the plaintiff's failure to object at the deposition hearing constituted a waiver of the evidentiary objection.

The contents of the V.A. medical records established the following conduct as a result of his alcoholic tendencies: (1) Since 1958, Strelecki had been in and out of the hospital for various lengths of time and had been an inpatient for 156 days preceding the 1973 Christmas holidays; (2) the deceased's suicidal attempts and "ruminations"; (3) the deceased's extramarital affair; (4) the deceased's attempts to molest his teenage daughter and his conduct in encouraging her to drink; (5) physical abuse and persistent quarreling with his wife, mother and son; (6) the deceased was virtually unemployable as a result of his drinking problem.

Additionally, the medical records revealed that Strelecki told the V.A. doctors that during 1973 his drinking increased as a result of problems with his family, in particular, that his son was sentenced to a term under the Huber Law and that his unwed daughter became pregnant. The record is void of any evidentiary objection by the plaintiff to this testimony; however, following its introduction the plaintiff moved for a mistrial alleging that certain testimony was highly inflammatory in nature. The motion was denied, the trial court again noting the plaintiff's failure to object to the testimony during the deposition hearing.

*Issues:*

1. Did the trial court err by refusing to submit to the jury the plaintiff's proposed special verdict limiting the liability inquiry to whether or not the premises' stairway constituted a "trap" within the law pertaining to licensors and licensees?

2. Did the trial court err by allowing the admission of medical records that were not prepared by the testify-

ing medical expert who relied partially upon these records in formulating his opinions and testimony?

3. Did the trial court err in not declaring a mistrial based upon the inflammatory and prejudicial content of the medical records?

It is the plaintiff's theory of liability that the platform-stairway arrangement in the Hintz home constituted a "trap" due to its irregular construction. The construction of the stairway in the Hintz home may be described as follows: the outside door opens into the house across an irregularily shaped platform; a set of basement stairs, opposite the outside door, descend from this platform; a set of stairs leading to the kitchen ascend from the surface. The dimensions of the "trapezoid" surface are: 54″ in width measured parallel to the outside door and the basement stairs; the platform is 25″ at the narrowest point perpendicular to the doorway and 36½″ at its widest point perpendicular to the door and adjacent to the kitchen stairs. The riser on the first basement stair is set in a diagonal position conforming to the edge of the "trapezoid" surface. The outside door in its fully open position projects beyond the platform and over the first basement stair. The kitchen and basement stairways are bordered on each side by walls.

The parties to this appeal do not dispute the fact that Strelecki was a social guest in the Hintz home. Therefore, the duty of care owed by the Hintzes to Strelecki is determined by the rights and duties that exist between a licensor and a licensee.[1] A landowner or a licensor may be liable for the injuries suffered by a licensee in either

---

[1] In *Antoniewicz v. Reszczynski*, 70 Wis.2d 836, 236 N.W.2d (1975) the invitee and licensee distinction was abolished. The court held that, except as to trespassers, the duty of ordinary care was owed by landowners to all persons upon their lands but that this holding had prospective application only and would not affect cases where the injuries were received prior to the date of the *Antoniewicz* mandate. *Supra* at 858.

of two situations: (1) when the injury has resulted from the presence of a "trap" on the premises; or (2) when a licensee's injuries are caused by the licensor's active negligence. *Mariuzza v. Kenower,* 68 Wis.2d 321, 228 N.W.2d 702 (1975); *Kaslo v. Hahn,* 36 Wis.2d 87, 89, 153 N.W.2d 33 (1967); *Scheeler v. Bahr,* 41 Wis.2d 473, 476, 164 N.W.2d 310 (1969); *Szafranski v. Radetzky,* 31 Wis.2d 119, 126, 141 N.W.2d 902 (1966). There are no claims made in this case that Strelecki fell as a result of the Hintzes' or Mullis' active negligence.

In *Szafranski v. Radetzky* a "trap" was defined in the following terms:

"A 'trap' arises when the owner fails to disclose to the licensee a known but concealed danger." *Id.* at 126.

The licensor owes a licensee the duty of giving adequate warning apprising the licensee of a hazard which is known to the licensor but which is not readily observable. *Mariuzza v. Kenower, supra* at 328; *Scheeler v. Bahr, supra* at 477; *Kaslo v. Hahn, supra* at 91. However, even if a landowner knows of a danger, he does not owe the licensee a duty of warning if the danger is perfectly obvious. *Scheeler v. Bahr, supra* at 478. The proposition stated above is fully explained in the following language:

"2 Harper and James, *Law of Torts,* p. 1455, sec. 27.5, points out:
" 'People usually avoid obvious and appreciated dangers, and others may reasonably assume that they will.'
"Harper and James, *supra,* pp. 1472, in discussing the duty owed a licensee, says:
" 'He [the licensor] would not, of course, be negligent . . . if he might reasonably assume that the licensee, knowing he has no right to expect premises to be prepared for his safety, would observe the danger. . . .' "

*Id.* at 478.

The plaintiff-appellant argues that on the basis of the testimony and evidence submitted at trial, the trial court

was in error when it refused to submit to the jury a special verdict tailored to the question of whether the Hintzes' stairway arrangement constituted a "trap." In *Mariuzza v. Kenower, supra,* this court approved the use of an "all or nothing-at-all" "trap" theory special verdict. *Id.* at 332. Thus, in order for the plaintiff-appellant to be entitled to the "trap" special verdict jury question, the proof submitted at trial must raise a jury issue as to whether (1) the hazard was concealed; and (2) the Hintzes knew of the concealed danger.

In support of Mrs. Strelecki's case she produced two experts in the home construction industry, Robert Zygmutt, a home designer, and Anthony Groh, a civil enginee. Zygmutt was of the opinion that the stairway arrangement was a hazardous condition and stated he had never seen a similar doorway-platform design. Groh agreed that the stairway-platform design constituted a hazard. However, Groh explained that his opinion was based upon his 30 years of experience as a general contractor and that he would not expect the average lay person to be aware of the design hazard. The record is void of direct proof that the Hintzes knew of an extraordinary hazard created by the door-stairway and platform arrangement beyond the normal and obvious dangers associated with a stairway.[2]

Groh's testimony and the failure to establish that the Hintzes were aware of any special danger posed by the stairway negates as essential element in the "trap" doctrine that the hazard must be "a *known* but concealed danger." (emphasis supplied). *Szafransky v. Radetzky,*

---

[2] In *Schoenfeldt v. Babcock,* 26 Wis.2d 569, 576, 133 N.W.2d 262 (1965) the court stated:

"A householder is not under a legal duty to warn of the presence of regular stairs unless, by reason of special circumstances, such stairs are secreted, camouflaged or otherwise situated so as to constitute a trap; . . ." *Id.* at 576.

*supra* at 126. In *Terpstra v. Soiltest,* 63 Wis.2d 585, 218
N.W.2d 129 (1973), this court stressed the fact that in
order for a licensor to incur liability for maintaining a
"trap" on his premises, the licensee must prove the land-
owner *knew* of the concealed hazard. In *Terpstra,,; a por-
tion of a defectively constructed building fell on the
plaintiff and we stated the following with regard to the
applicability of the "trap" doctrine:

"As to passive conditions on the land, the licensor is
under no obligation to a licensee for conditions of which
he does not know. [citations omitted.]
". . .
"All that was arguably shown was a negligently con-
structed building. Even if such negligence were conceded,
the building as constructed did not constitute a trap, for
no danger was apprehended or known by the defend-
ants. . ." *supra* at 592.

Thus, based upon a review of the evidence and applicable
case law, we hold the trial court correctly ruled that the
requested "trap" special verdict form would have con-
stituted error if submitted to the jury for consideration
in this case.

In the second issue on appeal, the appellant claims the
trial court erred in admitting the deposition testimony of
a medical witness who relied on medical records he had
not personally prepared. The trial court overruled the
appellant's hearsay objection noting the party's failure
to make the objection at the deposition hearing. This
issue is controlled by sec. 804.07(2) and (3)(c)1, Stats.,
which recite:

"(2) OBJECTIONS TO ADMISSIBILITY. Subject to the pro-
visions of s. 804.03(2) and sub. (3)(c) of this section,
objection may be made at the trial or hearing to receiv-
ing in evidence any deposition or part thereof for any
reason which would require the exclusion of the evidence
if the witness were then present and testifying.
"(3) EFFECT OF ERRORS AND IRREGULARITIES IN DEPOSI-
TIONS. (a) *As to notice.* All errors and irregularities in

the notice for taking a deposition are waived unless written objection is promptly served upon the party giving the notice.

"(c) *As to taking of deposition.* 1. Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time."

The interrelationship of sec. 804.07(2), Stats., to the limitations stated in sec. 804.07(3)(c)1, has been explained in the following manner:

"Where a deposition is substituted for direct testimony during the trial under subsection (1), subsection (2) permits a party to object to the admissibility of the testimony contained in the deposition just as if the deponent were actually present and testifying. However, subsection (2) is qualified in several respects by the more specific provisions of subsection (3).

"Under subsection (3)(c)1 objection s to the competency of a witness to testify or to the 'competency, relevancy, or materiality' of testimony need not be made at the time the deposition is taken unless the ground is one which could have been obviated or removed at that time. The language of this rule is somewhat outdated. By preserving the phrase 'competency, relevancy, or materiality' of the former statute, the new rule perpetuates evidentiary categories which have been abandoned by the Wisconsin Rules of Evidence. But by the terms of this subsection, objections which might be 'obviated or removed' must be made at the taking of the deposition in order to preserve them during the trial. It is important to note that such objections include objections based on lack of foundation testimony, failure to properly authenticate documents or other tangible things, or any other objections which might be cured by supplemental questioning." Gracyzk, "The New Wisconsin Rules of Civil Procedure: Ch. 804", 59 Marq. L. Rev. 463 at 504–05.

The rule stated in sec. 804.07(2), Stats., permitting the objection to deposition testimony to be raised for the first

time at trial, is limited by the dictates of sec. 804.07(3)(c)1, reciting an objection is not waived "unless the ground of the objection is one which might have been obviated or removed if presented at that time." The authoritative commentary quoted above indicates that sec. 804.07(3)(c)1, requires an objection at deposition only if the deficiency may be cured by supplemental questioning. The evidentiary deficiency addressed by the hearsay objection cannot be cured by further questioning and therefore pursuant to sec. 804.07(2) and (3)(c) 1, cannot be waived by a failure to raise the objection at the deposition hearing.

Even though we reach the foregoing conclusion that the plaintiff had not waived her evidentiary objection, the trial court was not in error when it permitted the introduction of Dr. O'Loughlin's testimony which relied on medical records he had not personally prepared as these medical records are admissible pursuant to sec. 908.03(6), Stats.:

"(6) RECORDS OF REGULARLY CONDUCTED ACTIVITY. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, unless the sources of information or other circumstances indicate lack of trustworthiness."

Dr. O'Loughlin, a qualified expert witness, was Strelecki's treating physician for a period of time and refreshed his recollection of his personal observation, opinion, diagnosis and treatment history from the medical records kept in the regularly conducted activities of the Tomah Veteran's Administration Hospital. Thus, the introduction of this evidence complied with the require-

ment of trustworthiness set forth in the case law and statutes.

The appellant contends that *Vinicky v. Midland Mutual Casualty Ins. Co.*, 35 Wis.2d 246, 151 N.W.2d 77 (1967) prohibits the admissibility of hearsay medical records except for purposes of impeachment. The appellant's reliance on *Vinicky* is misplaced as the holding in that case was expanded in *State v. Cadden,* 56 Wis.2d 320, 325–26, 201 N.W.2d 773 (1972) and *Rennick v. Fruehauf,* 82 Wis.2d 793, 907–08, 264 N.W.2d 264 (1978). In *State v. Cadden, supra,* the court stated:

"Objection was also made to the portion of the psychiatrists' testimony based upon court records containing medical information pertinent to the mental health of Attorney Cadden during the course of other proceedings. This court has, however, consistently held that a physician may properly testify and support a diagnosis, the foundation for which is gleaned in part from medical evidence of which he has no personal knowledge and which is obtained from the medical reports of others. *Roberts v. State* (1969), 41 Wis.2d 537, 549, 164 N.W.2d 525; *Vinicky v. Midland Mut. Casualty Ins. Co.* (1967), 35 Wis.2d 246, 254, 151 N.W.2d 77; *Sundquist v. Madison Railways Co.* (1928), 197 Wis. 83, 87, 221 N.W. 392. We have previously held that, since in their daily practice physicians normally rely on the facts and opinions of other experts, courtroom testimony, when based on the medical observations and findings of others, is sufficiently reliable to permit medical conclusions. This exception to the hearsay rule comports with accepted standards of medical practice. Moreover, in this case, the conclusions of the psychiatrists were based not only on the opinions of others but upon their personal observations of Attorney Cadden at the hearing. The testimony was admissible under the rules of evidence of this state and was reliable. *Rupp v. Travelers Indemnity Co.* (1962), 17 Wis.2d 16, 20, 115 N.W.2d 612; McCormick, *Evidence* (2d ed. hornbook series), pp. 35, 36, sec. 15. The psychiatrists were submitted to extensive and unrestricted cross-examination by Attorney Cadden and by his counsel." *Id.* at 325–26.

In *Rennick v. Fruehauf, supra,* the admissibility of this form of hearsay evidence on direct examination as well as for purposes of impeachment on cross-examination was reiterated in the following language:

"The defendant maintains that it was error for the trial judge to permit the plaintiff's attending physician to read from the report of a consulting neurologist. The testimony was admitted based on the rule in *Vinicky v. Midland Mut. Cas. Ins. Co.,* 35 Wis.2d 246, 254, 256, 151 N.W.2d 77 (1967). In *Vinicky,* a medical expert's diagnosis based on medical evidence which he gleaned from the reports of others was admissible, as well as the introduction of the relevant and competent portions of those reports by the adverse party for the purposes of impeachment and in the interests of completeness. However, the Judicial Committee's notes to sec. 908.03(6), Stats. (1975), pertaining to the hearsay exception for records of regularly conducted activity, suggest allowance of medical opinions and the diagnoses from hospital records in direct proof. Likewise, the medical opinions and diagnoses contained in the report of a consulting specialist, used by the testifying medical expert in making his diagnosis has sufficient trustworthiness to permit admission in direct proof." *Id.* at 807–08.[3]

The final issue raised by the appellant is that the trial court should have granted a motion for mistrial based upon the inflammatory and prejudicial nature of testimony received at trial. The contents of the medical records relied upon by Dr. O'Loughlin exposed the following regarding Strelecki's life since 1958: (1) his alcoholic

---

[3] The Judicial Committee Notes to the Code of Evidence (1975) states the following in regard to sec. 908.03(6):

"Note that this section considers these exceptions to be possessed of sufficient guarantees of circumstantial trustworthiness to eliminate the need for production of the declarant or conversely to establish the practical unavailability of the declarant. Evidence of the kind hereinafter described in the various exceptions does not automatically become admissible. Admissibility continues to be subject to the various rules of relevancy, competency, authentication, etc."

condition; (2) he fought with and assaulted his wife, mother and son; (3) he had problems maintaining gainful employment; (4) he had an extramarital affair; (5) the more Mrs. Strelecki complained about his drinking habits, the more he would drink; (6) he had contemplated suicide; (7) he had attempted to molest his daughter and encouraged her to indulge in excessive drinking; (8) he was not having marital sex with Mrs. Strelecki; (9) his son had been criminally involved and placed under the Huber Law; and (10) his unwed daughter was pregnant.

The relevancy of this information is determined by the Evidence Code requirements of sec. 904.01, Stats. The provisions reads:

"**Definition of 'relevant evidence.'** 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

However, even if the evidence is deemed initially relevant, sec. 904.03, Stats., permits the exclusion of the evidence if the probative value of the information is outweighed by the following factors:

"**904.03.** Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The relevancy of the evidence adduced regarding Mr. Strelecki's conduct must be considered in light of the fact that the appellant's wrongful death claim seeks damages for her pecuniary loss and the loss of society and companionship. In *Schwartz. v. Milwaukee*, 54 Wis.2d 286, 195 N.W.2d 480 (1972) the court listed the factors

to be considered in determining a spouse's loss of society and companionship as a result of injury or death to the other spouse. These factors are:

". . . love, companionship, affection, society, sexual relations and the right of support or the performance of marital services . . . [citations omitted]." *Id.* at 292.

In the application to the present appeal we hold that the evidence regarding Strelecki's personal conduct dealing with his periodic hospitalization for alcoholism, his fighting and assaulting his wife, mother and son, his extramarital activities, his attempts to molest his daughter, his suicidal tendencies and the lack of marital sex with Mrs. Strelecki to be relevant to the determination of Mrs. Strelecki's claim for loss of society and companionship. The Judicial Council Committee's Note accompanying sec. 904.01 recites the following standards with which relevancy is to be determined:

"Any evidence that assists in getting at the truth of the issue is relevant; in other words, *any fact which tends to prove a material issue is relevant, even though it is only a link in the chain of facts which must be proved to make the proposition at issue appear more or less probable. . ." Oseman v. State,* 32 Wis.2d 523, 526, 145 N.W.2d 766, 768–69 (1966). In *Zdiarstek v. State,* 53 Wis.2d 420, 428, 192 N.W.2d 833, 837 (1972) the *Oseman* case was quoted: '[t]he criterion of relevancy is whether or not the evidence adduced tends to cast any light upon the subject of the inquiry.' *State v. Becker, supra,* adopted McCormick's view of the distinction between materiality and relevancy which is imported into s. 904.01 by the phrase 'that is of consequence to the determination of the action.' "

However, we cannot reach the same conclusion on the evidence relating to the Huber Law commitment of Strelecki's son and his unwed daughter's pregnancy. We

hold evidence regarding the past conduct or indiscretions of family members in these particular circumstances is not relevant to Mrs. Strelecki's claim for pecuniary loss and loss of society and companionship. On the other hand, evidence of the deceased's recurring hospitalization and that the most recent treatment period numbered 156 days, thus contributing to his loss of time from employment, are relevant factors to the question of pecuniary damages.

The appellant claims the prejudice resulting from the introduction of this evidence is manifested in the jury's determination of no liability and the refusal to award any damages for loss of society and companionship. We hold the appellant's claim of prejudice is without merit. In determining the necessity for a new trial due to the admission of prejudicial evidence, this court has noted the effect of the inadmissible evidence should be weighed against the totality of the sufficient credible evidence supporting the verdict. *In re Estate of Glass*, 85 Wis.2d 126, 147, 270 N.W.2d 386 (1978). The jury's determination that Strelecki was solely at fault for the accident is supported by the evidence establishing his highly intoxicated condition at the time of the accident. Further, the denial of damages for loss of society and companionship is substantiated by the evidence regarding the deceased's marital and family problems. As to the reference made by the plaintiff-appellant to the "prejudicing" effect on her recovery of pecuniary damages in the sum of $10,000, the jury was free to find that Strelecki's frequent bouts with alcoholism and recurring hospital stays up to a 156-day period of confinement three weeks before trial certainly substantially interfered with his gainful employment.

The overwhelming credible evidence in this case when applied to the totality of the sufficient credible evidence

test supports the jury verdict. Consequently, we hold that the appellant's claim of being denied a fair determination of the wrongful death claim by the introduction of the prejudicial nature of certain evidence is without merit.

*By the Court.*—Judgment affirmed.