STATE of Wisconsin, Plaintiff-Respondent,†

v.

Brian K. AVERY, Defendant-Appellant.

Court of Appeals

*No. 2010AP1952. Submitted on briefs May 3, 2011.
—Decided October 4, 2011.*

2011 WI App 148

(Also reported in 807 N.W.2d 638.)

† Petition for Review granted 2-23-12.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Keith A. Findley*, *Tricia Bushnell*, *Claire Norsetter* and *Jamie Yoon* of the *Wisconsin Innocence Project* of the *University of Wisconsin Law School*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *James M. Freimuth*, assistant attorney general.

Before Fine, Kessler and Brennan, JJ.

¶ 1. KESSLER, J. Brian K. Avery appeals from an order of the trial court denying his motion for a new trial. The motion was based on newly discovered evidence, or alternatively, in the interest of justice. After an evidentiary hearing during which both Avery and the State presented expert opinion testimony involving the new evidence, the trial court denied the motion, finding that there was not a reasonable probability that a different result would be reached by a jury in a new trial. We conclude that the trial court[1] erred as a matter of law when it denied Avery's motion for a new trial because the record indicates that the trial court erroneously usurped the jury's function when it weighed credible testimony from the competing experts. We reverse and remand for a new trial.

## BACKGROUND

¶ 2. In July 1994, Avery was charged with two counts of armed robbery, party to a crime, contrary to WIS. STAT. §§ 943.32(1)(b) & (2) and 939.05 (1993–94).[2] The first count charged the armed robbery of Malone's Fine Foods (Malone's), 3610 North Teutonia Avenue, Milwaukee, by four black males with guns on July 7, 1994, at approximately 8:30 p.m. The second count

---

[1] The Honorable Patricia McMahon presided over the trial and the first resolution of the postconviction motion for a new trial. The Honorable Dennis R. Cimpl, as successor to Judge McMahon's calendar, presided over the hearing on the postconviction motion for a new trial after we summarily reversed Judge McMahon's decision to deny Avery's motion for a new trial and remanded the matter to the trial court.

[2] The language of the 1993–94 statutes at issue has not changed in a way that affects this appeal. All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

charged the armed robbery of Atari Food Market (Atari), 2909 North Holton Street, Milwaukee, by five black males with guns on July 8, 1994, at approximately 1:40 p.m. Both stores had interior video surveillance cameras. Avery was tried on both charges, but separately from others charged with these robberies. The jury found Avery guilty as to each charge. Avery was sentenced to ten years in prison for the Malone's robbery, and twenty years in prison for the Atari robbery, consecutive to the term for the Malone's robbery.[3]

¶ 3. In October 2007, Avery moved for postconviction relief under WIS. STAT. § 974.06 (2007–08). He sought a new trial based on newly discovered evidence and in the interest of justice under WIS. STAT. § 752.35 (2007–08). The new evidence was a new method of digitally enhancing the videotape from the surveillance camera at Malone's, making photogrammetric analysis possible. The videotape was digitally enhanced by a method not available at the time of trial. Avery claimed the new video enhancement and photogrammetric analysis showed that the person identified as Avery in the videotape was actually several inches shorter than Avery. Avery's booking photo, taken after his arrest on July 10, 1994, established that he was six feet, three inches tall, had a mustache, wore his hair short and flat on the top and faded to extremely short hair on the sides and back. Thus, Avery argued, it was reasonably

---

[3] Prior to his direct appeal, Avery sought a new trial on multiple grounds. By an order dated October 1, 1996, Judge McMahon denied some of Avery's claims, and after an evidentiary hearing, she denied the remaining claims by an order dated January 9, 1997. On Avery's ensuing direct appeal, this court affirmed the judgment and postconviction orders in a *per curiam* decision filed December 1, 1998.

probable that the jury would have a reasonable doubt as to whether he was involved in the robberies. After briefing, the trial court denied the motion without a hearing. Avery appealed.

¶ 4. We summarily reversed and ordered an evidentiary hearing on Avery's newly discovered evidence claims. In that order we noted:

> The videos of both robberies were VISAR-enhanced.[4] Avery explains that *the suspect's height was determined solely from the Malone video because the Atari video angle and field of view did not allow the measurements necessary to determine the suspect's height.* For purposes of the impending evidentiary hearing, we conclude that the newly discovered evidence claim may also be relevant to the Atari robbery because of the similarity of circumstances and suspects.

*See State v. Avery*, No. 2008AP500–CR, unpublished slip op. at 5 n.3 (WI App Mar. 20, 2009) (emphasis added).

¶ 5. At the evidentiary hearing, both Avery and the State produced witnesses, found by the trial court to be experts, who acknowledged that the specific enhancement technology, VISAR, did not become commercially available or affordable until 1998.[5] Avery's expert, Gene Grindstaff, explained that photogrammetry involves applying the science of measurement to still pictures

---

[4] VISAR is an acronym for "Video Image Stabilization and Registration." It is technology developed by NASA and was first used by the FBI to assist in analyzing videotape of the bombing that occurred at the 1996 Olympic Summer Games in Atlanta.

[5] The State acknowledges that the enhanced video technology applied to the surveillance video and analyzed by photogrammetry techniques, "was discovered after conviction, not due to Avery's negligence, is material to the issue of Avery's identity as one of the robbers in the Malone's videotape (and by

and videos, and that it is a well-established and valid science. The State's expert, Richard Vorder Bruegge, agreed that photogrammetry is a validated science and stated that it is relied upon by the government and courts to ascertain the heights of individuals in surveillance videos, among other things. The trial court did not find either expert incredible.

¶ 6. Both experts expressed opinions about the height of the person identified as Avery in the Malone's robbery video.[6] Grindstaff concluded to a reasonable degree of scientific certainty that the video suspect, standing against the door frame, was five feet, ten and one half inches tall, plus or minus one inch. Vorder Bruegge testified that the best measurement he could make of the video suspect, as the suspect walked through the door of Malone's, was six feet and one half inch tall, plus or minus one inch, although acknowledging that the suspect could be as short as five feet, eleven and one half inches. Vorder Bruegge stated that he could neither rule out the possibility, nor conclude affirmatively, that the video suspect was six feet, three inches tall.

¶ 7. After hearing the new evidence testimony, the trial court found the first four prongs of the newly discovered evidence test had been met. As to the fifth prong,[7] the trial court explained:

---

extension, his identity as one of the robbers in the Atari robbery videotape), and is not merely cumulative of the evidence adduced at trial."

[6] Neither expert used the Atari surveillance video. Grindstaff testified he was not able "to do anything with the Atari robbery" surveillance video. Vorder Bruegge also used only the Malone's video.

[7] The test for a new trial based on newly discovered evidence is: (1) the evidence was discovered after trial; (2) the

I look at Vorder Brugge's testimony[] [n]ot for his conclusions, but *as an attack on the reliability* of Grindstaff's testimony. Grindstaff makes the — ultimate conclusion that the subject that we were referring to in no way can be taller than 6 foot.

(Emphasis added.) The trial court concluded that in a new trial the new evidence was

simply not going to make a difference. It's not reliable enough. It's not like D.N.A. evidence — [i]t's not like a retraction of a confession — [i]t's not like when somebody else confesses to a crime.

¶ 8. The trial court also found that the new evidence did not justify a new trial in the interest of justice under WIS. STAT. § 752.35 because the new evidence did not "totally destroy the prosecution's case," although "certainly, the photogrammetry evidence could chip away at the prosecution's case but it wouldn't destroy it."[8] Avery now appeals. Additional facts are provided as relevant to the discussion.

moving party was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; (4) the evidence is not merely cumulative to the evidence that was introduced at trial; and (5) it is reasonably probable that a different result would be reached on a new trial. *See State v. Edmunds*, 2008 WI App 33, ¶ 13, 308 Wis. 2d 374, 746 N.W.2d 590.

[8] The Dissent argues that we took the trial court's comments out of context and independently argues that "DNA is unquestionably 'hard' scientific evidence, unlike opinion testimony." *See* Dissent, ¶ 51. However, even expert witnesses who testify about their DNA testing express their opinions as to the probability that a known sample (the defendant's) and a questioned sample (the crime scene evidence) "match." This opinion perhaps sounds more like "hard" science because the opinion is generally expressed in mathematical probability. *See* WIS. STAT. § 767.84(1m) ("If genetic tests ordered under this section or s. 49.225 show that the alleged father is not excluded and that the

## DISCUSSION

¶ 9. Avery argues that the trial court exceeded its authority by weighing the competing expert testimony and choosing for itself which expert analysis was more credible. He alternatively argues that he was entitled to a new trial in the interest of justice. We agree.[112]

### I. *Standard of Review.*

■

¶ 10. The trial court may grant a new trial based on newly discovered evidence only if the following requirements are met:

> (1) the evidence was discovered after trial; (2) the moving party was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; (4) the evidence is not merely cumulative to the evidence that was introduced at trial; and (5) it is reasonably probable that a different result would be reached at a new trial.

*State v. Terrance J.W.*, 202 Wis. 2d 496, 500, 550 N.W.2d 445 (Ct. App. 1996).

■

¶ 11. Motions for a new trial based on newly discovered evidence are submitted to the sound discretion of the trial court. *Id* "We review a [trial] court's

statistical probability of the alleged father's parentage is 99.0% or higher, the alleged father shall be rebuttably presumed to be the child's parent.").

Like the trial court, the Dissent appears to be expressing its confidence in one expert and lack of confidence in the other. We do not understand that as the test to be applied by the trial court or by this court.

determination as to whether a defendant has established his or her right to a new trial based on newly discovered evidence for an erroneous exercise of discretion." *State v. Edmunds*, 2008 WI App 33, ¶ 8, 308 Wis. 2d 374, 746 N.W.2d 590. "A court properly exercises its discretion if it relies on the relevant facts in the record and applies the proper legal standard to reach a reasonable decision." *Id.* "Thus, '[w]e will find an [erroneous exercise] of discretion if the [trial] court's factual findings are unsupported by the evidence or if the court applied an erroneous view of the law.' " *Id.* (citation omitted; first two sets of brackets in *Edmunds*). A trial court applies an erroneous view of the law when it conducts tasks meant solely for a jury. *State v. McCallum*, 208 Wis. 2d 463, 474–76, 561 N.W.2d 707 (1997).

¶ 12. A new trial based on newly discovered evidence implicates constitutional rights. *State v. Coogan*, 154 Wis. 2d 387, 394–95, 453 N.W.2d 186 (Ct. App. 1990). Whether due process warrants a retrial is a constitutional question subject to *de novo* review. *Id.* at 395. We review independently whether the new evidence allows for a reasonable probability that a jury would have a reasonable doubt as to Avery's guilt. *See McCallum*, 208 Wis. 2d at 474–76. In our review, we may not determine whether some competing credible evidence is entitled to greater weight than other credible evidence—that task is solely for the jury. *Id.*

II. *Trial Evidence.*

A. *The Malone's Robbery*

¶ 13. At approximately 8:30 p.m. on July 7, 1994, four men entered Malone's, displayed guns, and de-

manded money from Ahmed Hasan, the owner of Malone's. Hasan gave the robbers cash, hairspray and cigarettes.

¶ 14. A video surveillance camera was mounted near the ceiling on a back wall of the store, and a TV monitor was positioned behind the counter. Hasan testified that a "girl" in the store told the robbers, "you are in the camera," prompting one of the robbers to shoot at the camera and the TV monitor, hitting both the monitor and the store's upper rear wall. Portions of a videotape of this robbery were played for the jury.

¶ 15. Fifteen-year-old Alcherie Simmons testified at the trial and identified herself in the videotape as the "girl" in Malone's during the robbery; however, she denied that she told the robbers about the surveillance camera. Milwaukee Police Detective Ralph Spano spoke to Simmons on the night of the robbery. Detective Spano stated that Simmons identified one of the robbers by the nickname of "Poo[h] Bear" from Riverside High School The next day at the police station, Detective Spano showed the videotape of the robbery to Simmons. According to Detective Spano, Simmons was able to identify the four Malone's robbers as: (1) "Poo[h] Bear," whose first name may be "James"; (2) "DeShawn," nicknamed "Dope Fiend"; (3) "Cockeye," because he had "a lazy eye" and also used the nickname "Poo[h] Bear"; and (4) "Brian," whom Simmons recognized from the Sherman Park Boys and Girls Club.

¶ 16. Detective Spano said that Simmons described Brian as being between five feet, ten inches to six feet tall, and approximately sixteen years old. At the time of the Malone's robbery, Avery was nineteen years old. The next day, Simmons was given "a stack" of individual photos from which she picked out Avery's photo as the Malone's robber who held a sawed-off shotgun.

571

¶ 17. At trial, Simmons denied identifying the Malone's robbers to police, including at a show-up at the police station. She also denied ever seeing Avery at the Sherman Park Boys and Girls Club. Simmons acknowledged, however, that she has known Avery since she was "little" because Avery lived nearby.

¶ 18. Avery presented alibis as to both robberies at trial. He testified that from 7:00 p.m. to 8:30 p.m. on the night of the Malone's robbery, he was at North Division High School watching basketball games with his friends Deandre Harris and Euell Clinton, and that after 8:30 p.m. he went to Clinton's grandmother's house until 10:00 p.m. Several witnesses who knew Avery testified to seeing or speaking with him at North Division High School at various times before approximately 8:30 p.m. Ulric Cobb, the then-coach of the University of Wisconsin-Milwaukee basketball team, who knew Avery from coaching him on "AAU teams," and William Marifke, who assisted Cobb in coaching AAU basketball, each testified that he either saw or spoke with Avery at the high school between 7:40 p.m. and 8:10 p.m. on July 7, 1994. Douglas Lewis, the then-assistant coach at the University of Wisconsin-Milwaukee, said he sat next to Avery at the high school for thirty to forty-five minutes on the night of July 7, 1994, and saw Avery still in the gym "[a]round 8:15" p.m. Donna Reed, who also knew Avery, was officiating basketball games at the high school. She testified that she talked to Avery twice that evening, the last time being at about 8:15 p.m.

¶ 19. Detective Spano testified that Malone's is located 1.3 miles from North Division High School, a distance that he says can be traveled by car in two minutes and forty seconds.

## B. *The Atari Robbery*

¶ 20. On the afternoon of July 8, 1994, Mueen Hamdan was working at Atari with his cousins, Hiba and Murad Hamdan, when five men entered the store, displayed guns, and demanded money. According to Hiba's testimony, the robbers ordered the three employees to "get down," and one of the robbers hit Mueen in the head with a shotgun. Both Mueen and Hiba said the robbers looted the cash register. One robber shot Mueen in the neck while Mueen lay on the floor. A video surveillance camera made a grainy videotape of the robbery, portions of which were played for jurors.

¶ 21. At a police line-up on July 11, 1994, five eyewitnesses to both robberies were unable to identify Avery—Hasan, Simmons, Hiba, Shamshad Hussain and Daniel Washington. About three weeks after the robbery, Mueen viewed a series of front and side-view photographs at his home. He testified that the robber he identified as Avery had a clean-shaven head and was not wearing a hat, however the surveillance video showed that the suspect identified as Avery was wearing a baseball-type hat. Mueen identified Avery at trial.[9]

---

[9] The Dissent notes that two eyewitnesses identified Avery at trial. *See* Dissent, ¶ 53. However, the Dissent disregards the fact that one of those eyewitnesses, Mueen, initially described Avery in a manner completely inconsistent with the videotape and that five eyewitnesses from the two robberies could not identify Avery in a police lineup. Considerable research has established that eyewitness identification is fraught with problems of reliability and trustworthiness. *See, e.g.,* BRANDON T. GARRETT, CONVICTING THE INNOCENT: WHERE CRIMINAL PROSECUTIONS GO WRONG, (Harvard University Press, 2011); *see also* Adam Liptak, *In Case of Eyewitnesses v. Alibi; a Question of Lawyers Competence,* N.Y. TIMES, May 3, 2011, at A11; *see also*

¶ 22. Avery also presented an alibi defense to the Atari robbery. The testimony at trial indicates that the Atari robbery occurred sometime between 1:30 p.m. and 1:50 p.m. Avery testified that he woke up between 12:30 p.m. and 1:00 p.m. that day and did not leave the home he shared with his mother until 3:00 p.m. He said he phoned Courtney Williams, a former high school classmate, from home at 1:46 p.m. that day, as reflected in a phone bill. Both Avery and his sister testified that Avery's phone line was in his sister's name; however, Williams stated that she never spoke on the phone with any members of Avery's family other than Avery. Laron Harris, Avery's teenage cousin, testified that he arrived at Avery's house by bike between 12:00 p.m. to 12:30 p.m. on that day, and that he ate lunch with Avery at "[a]round 1:30" p.m. Avery's sister testified that when she arrived at around 1:10 p.m., Avery was outside talking with their mother. She said she saw Avery coming in and out of the house for "an hour or so or more" to check whether his laundry hanging outside was dry. She also stated that she last saw Avery after 3:00 p.m. and that she was sure of the time because she recalled their mother returning home from errands around that time and she could see a clock inside the house from the backyard where she was sitting.

C. *Avery's "Confession"*

¶ 23. Milwaukee police arrested Avery at his home early in the morning of July 10, 1994. In his first interview, which ended at 5:30 a.m., Avery denied any involvement in either robbery. Avery gave police detailed accounts of his activities with friends and family

*State v. Henderson,* ___A.3d___ (N.J. 2011)(acknowledging a lack of reliability in eyewitness identifications).

on both days and during both times. During a second interview in the afternoon of that same day, Detective William Blumenberg told Avery that Avery had been identified as a participant in the Malone's and Atari robberies by another suspect and by a witness in the store. Detective Blumenberg also told Avery that he believed Avery was on the two store videotapes. Avery was also told by police that his parents were shown the security camera videotape of the Malone's robbery, and that they "said that [his parents] think it's you." At that time, Avery did not know his parents steadfastly denied identifying him. Ultimately, Avery signed a detailed statement in which he admitted involvement in both robberies.

¶ 24. Avery testified at trial that during the second interview he "debated for at least an hour" with Detective Blumenberg about knowing anything about the robberies and that Detective Blumenberg left the room saying "when you are willing to talk, let me know." Avery further testified that another detective then came into the room and that when Avery asked if he could go home, the detective responded, "[y]es, if you cooperate." Avery stated that the statement he signed was a summary of what Detective Blumenberg told him had occurred and that Avery simply agreed to the version stated. Avery also testified that he wrote an apology when the detective suggested[10] that it would go

[10] The Dissent suggests that it is undisputed that Avery confessed because he was one of the robbers and that his apology was unsolicited by the police. The Dissent does not acknowledge the conflicting testimony about the police statements or Avery's explanation for the confession. See Dissent, ¶ 53. If a jury finds Avery's photogrammetry expert testimony more persuasive than the State's similar expert, the jury would conclude that Avery could not be the person in the video.

better for him, and because he still thought he would be released if he continued to cooperate. Avery wrote the following apology on the bottom of the signed statement.

> To whom it may concern: I am sorry about what had happened and I know that I am wrong about what happened and I am willing to go on the street and find out information for the police to find this violent person and put him away for what he did.
>
> I went along with him out of peer pressure and I was scared for my life and I did not know what he was going to do to me if I didn't go along with him. I have learned my lesson and I will not do it again.

¶ 25. When defense counsel asked Avery why he confessed[11] to participating in the two robberies, Avery replied:

> Because I was down there [at the station] for a long period of time, and I was hungry. And I was telling him the truth, and they didn't want to believe it.
>
> And then he said, "Well, if you cooperate you will be able to go home," and that's when I told him and I agreed that I had did (sic) it.

---

Avery's explanations for his confession and for his apology would also become much more persuasive.

[11] Research has also noted the problem of demonstrably false confessions. *See, e.g.*, Brandon L. Garrett, The Substance of False Confessions, 62 STAN. L. REV. 1051, 1051 (2010) ("Post-conviction DNA testing has now exonerated over 250 convicts, more than forty of whom falsely confessed to rapes and murders. As a result, there is a new awareness that innocent people falsely confess, often due to psychological pressure placed upon them during police interrogations.")(emphasis omitted).

III. *New Evidence.*

A. *Expert Testimony*[12]

¶ 26. Avery argues that the new evidence calls into question the height of the subject on the Malone's video and shows that the suspect is shorter than Avery. This, he contends, is evidence that the robber could not have been him, thereby confirming both his alibi defenses and his contention that his confession was false. Avery's height, as established by booking photographs at the time of his arrest, is six feet, three inches. Avery's expert concluded that the suspect could not be six feet, three inches, while the State's expert could not confirm or deny that conclusion.

¶ 27. Grindstaff, a government-certified metrologist, testified on behalf of Avery at the evidentiary hearing.[13] Grindstaff testified as to his qualifications, stating that he has taught courses specifically on how to make accurate measurements from videos for government agencies such as the FBI and CIA, and has been inducted into the Space Technology Hall of Fame. Grindstaff based his analysis on the enhanced video footage from the Malone's robbery.

¶ 28. Grindstaff explained ambiguities inherent in photogrammetry and the various steps he took to minimize inaccuracies in his measurements. For example, Grindstaff measured a video frame in which the video suspect's foot was visibly against the door frame,

[12] We do not decide what impact 2011 Wis. Act. 2 §§ 34m, 37, amending WIS. STAT. § 907.02 to adopt the *Daubert* reliability standard, has on this case. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The issue was not briefed and will not be considered by us.

[13] A metrologist is an expert in the science of measurement.

thus establishing that he was within the plane of the door (rather than actively passing through the door). Grindstaff concluded that even with various margins of error, the perpetrator in the video could not be as tall as Avery. He concluded that the video suspect alleged to be Avery was under six feet tall and there was no way the suspect could be as tall as six feet, three inches.

¶ 29. Vorder Bruegge, an employee of the FBI's digital evidence section in Quantico, Virginia, analyzed the videotape of the Malone's robbery for the State after Grindstaff completed his report. Grindstaff explained that "when a person is moving [photogrammetric measurement] is far less accurate than a person in a stationary position." Although Vorder Bruegge agreed with that principle, he elected to measure the video suspect striding through the door where neither foot was visible. Vorder Bruegge concluded the height of the video suspect was between five feet, eleven and one half inches to six feet, one and one half inches. Vorder Bruegge also stated that because of possible errors, ambiguities and variations, he could neither exclude the possibility that the video suspect was six feet, three inches tall, nor could he express an opinion that the video suspect was in fact six feet, three inches tall. He acknowledged that he knew that the State wanted to implicate Avery and that Avery was six feet, three inches tall before he did his analysis.

¶ 30. Vorder Bruegge explained the differences between his analysis techniques and Grindstaff's, stating that the two used different pixel scales and different still frames. Vorder Bruegge questioned Grindstaff's use of a still frame showing the suspect standing inside a door frame because such analysis assumes the suspect is standing erect. However, Vorder Bruegge also stated that height analysis is more accurate when a suspect is

still, rather than striding. Vorder Bruegge measured the suspect by averaging his height in several frames as the suspect was striding through the door. Vorder Bruegge pointed to various factors that he thought challenged the credibility of Grindstaff's analysis, including uncertainties about how much height Avery's shoes may have provided in his booking photos, the elevation of the security camera and the position of the camera lens and camera sensor, uncertainties about whether the suspect's knees were bent in the video, and the position of the suspect's head. However, Vorder Bruegge also acknowledged uncertainties in his method of analysis and acknowledged the various factors that affect a person's height at various points in time, including clothing, daily spinal changes and the height of the camera. Vorder Bruegge further acknowledged that a certain amount of subjectivity goes into a height analysis using this specialized technology. Vorder Bruegge ultimately concluded that he could not rule out whether the suspect on the video was six feet, three inches tall, but that he thought "6 and one-half inch [] is around the right height for the highest height that you are going to see [in that still]." Despite the inherent uncertainties in both methods of analysis, both experts determined that the suspect in the video was shorter than the height in Avery's booking photo.

B. *Analysis*

¶ 31. The court specifically found both Avery's expert and the State's expert qualified to offer expert opinions in a technical scientific field. However, the trial court's oral decision reflects that the court found Vorder Bruegge's criticisms of Grindstaff's analysis more persuasive than Grindstaff's explanations of his

579

analysis. By concluding that Grindstaff's opinions were "not *reliable enough*" to entitle Avery to a new trial, the trial court gave one opinion from a credible witness greater weight than a competing opinion from a different credible witness. (Emphasis added.)

¶ 32. A trial court applies an incorrect test when it weighs competing credible evidence. *See State v. McCallum*, 198 Wis. 2d 149, 158, 542 N.W.2d 184 (Ct. App. 1995) ("*McCallum I*"), *rev'd in part on other grounds by McCallum*, 208 Wis. 2d 463 (The trial court "applied the wrong standard when it — determined that [a] recantation was less credible than the original allegation [by that witness]."). A defendant "is not required to show that a different result is *assured*, merely that there is *a reasonable probability* of a different result." *McCallum I*, 198 Wis. 2d at 158 (emphasis added). Where "a reasonable jury could believe the [new evidence] or at least the [new evidence] *could* create a reasonable doubt as to the validity of the [trial evidence], the requirement of a reasonable probability of a different result is met." *Id*. (emphasis added).

¶ 33. In affirming our analysis of the new evidence in the above-cited case, our supreme court explained the test to be applied when analyzing newly discovered evidence:

> The correct legal standard when applying the "reasonable probability of a different outcome" criteria is whether there is a reasonable probability that a jury, looking at both the [new evidence] and the [trial evidence], would have a reasonable doubt as to the defendant's guilt.

*McCallum*, 208 Wis. 2d at 474 (citation omitted). The supreme court further emphasized the jury's role in assessing the credibility of evidence by stating:

580

It does not necessarily follow that a finding of "less credible" must lead to a conclusion of "no reasonable probability of a different outcome." Less credible is far from incredible. A finding that the [new evidence] is incredible necessarily leads to the conclusion that the [new evidence] would not lead to a reasonable doubt in the minds of the jury. However, a finding that [the new evidence] is less credible than the [old evidence] does not necessarily mean that a reasonable jury could not have a reasonable doubt.

*Id.* at 475.

¶ 34. In the case at bar, the trial court clearly weighed the expert testimony on its own.[14] It found that the new evidence was "simply not going to make a difference" in a new trial because "[i]t's not like D.N.A. evidence — [i]t's not like a retraction of a confession — [i]t's not like when somebody else confesses to a crime."[15] In making this finding, the trial court applied

---

[14] The trial court's statement is reminiscent of the standard jury instruction language on conflicting expert testimony, which states: "In resolving conflicts in expert testimony, weigh the different expert opinions against each other. Also consider the qualifications and credibility of the experts and the facts supporting their opinions." WIS JI—CRIMINAL 200. It appears the trial court applied this standard throughout the proceedings. For example, the court overruled an objection that a statement Vorder Bruegge made was speculative stating: "I think he is entitled to give me his expert opinion and *I am then free to take it for what it is worth*." (Emphasis added.)

[15] The trial court confused the perceived exoneration effect of DNA evidence with the much lower standard actually required to obtain a new trial. DNA evidence need not fully exonerate a defendant. In both *State v. Armstrong*, 2005 WI 119, ¶¶ 8, 154, 283 Wis. 2d 639, 700 N.W.2d 98, and *State v. Hicks*, 202 Wis. 2d 150, 153–56, 549 N.W.2d 435 (1996), the State argued that the particular DNA found at the crime scene could

the wrong standard and erroneously exercised its discretion. *See State v. Plude*, 2008 WI 58, ¶ 31, 310 Wis. 2d 28, 750 N.W.2d 42. A trial court is to determine only whether there is a reasonable probability that the new credible testimony would create a reasonable doubt as to the defendant's guilt. *See Edmunds*, 308 Wis. 2d 374, ¶ 19. It is not the function of the trial court in a motion for a new trial to weigh competing credible evidence. *Id.*, ¶ 18.

■■

¶ 35. In applying the test that the trial court should have used, we conclude that if a jury believes the height of the video suspect as put forth by expert analysis of new video enhancement technology, it is reasonably probable that a reasonable doubt as to Avery's guilt would exist. The alibi testimony from friends, family members and former coaches, which tends to indicate that Avery was not involved in either robbery, could become more persuasive when the video suspect's height is considered. The failure of any of the robbery victims to identify Avery in the physical line up conducted within a day or two of the robberies takes on added significance in the context of the evidence that the video suspect is inches shorter than Avery, as does Avery's initial denial of his involvement in either robbery. As to Avery's confession, it is reasonably probable that a jury would have a reasonable doubt as to the truth of the confession if it believes that the suspect on the video is shorter than Avery. All of the trial evidence,

have had nothing to do with the crime, and thus was of no consequence. The Wisconsin Supreme Court ordered new trials not because the DNA testing proved innocence—it did not—but simply because it was important to a full consideration of guilt or innocence. *See Armstrong*, 283 Wis. 2d 639, ¶ 2; *Hicks*, 202 Wis. 2d at 152–53.

combined with the new evidence from two experts, each of whom explained their methods of analysis and concluded that the video suspect is several inches shorter than Avery, establishes a reasonable probability that a jury would have a reasonable doubt as to Avery's guilt.

¶ 36. Simply put, if the jury believes the new evidence from Avery's expert, then it would conclude that Avery could not be the man in the video. This new evidence does not merely "chip away" at the State's case. The outcome of a trial including the new evidence will probably be different because if the jury believes this evidence, then it would conclude that Avery is *not* the man in the video, and he could not be one of the robbers.

IV. *Interest of Justice.*

¶ 37. Avery also argues that he is entitled to a new trial in the interest of justice under Wɪs. Stᴀᴛ. § 752.35. Section 752.35 authorizes discretionary reversal by the Court of Appeals for two reasons: (1) "if it appears from the record that the real controversy has not been fully tried," or (2) "it is probable that justice has for any reason miscarried."[16] The first basis for reversal, that "the real controversy has not been fully tried," often arises when "the jury was erroneously not given the

_____

[16] The second basis for reversal is that it is probable that "justice has for any reason miscarried." Wɪs. Stᴀᴛ. § 752.35. This requires that we conclude that a different outcome would result. *See Lock v. State*, 31 Wis. 2d 110, 118, 142 N.W.2d 183 (1966) ("In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial."). We are not relying on this § 752.35 factor and do not discuss it further.

opportunity to hear important testimony that bore on an important issue of the case." *State v. Henley*, 2010 WI 97, ¶ 81, 328 Wis. 2d 544, 787 N.W.2d 350; *see also State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983) ("'The defendant was denied the right to bolster his credibility through the testimony of police officers who held opinions as to his truthfulness. The exclusion of this evidence adversely affected the defendant since credibility is a determinative issue in this case."); *Garcia v. State*, 73 Wis. 2d 651, 655, 245 N.W.2d 654 (1976) (controversy was not fully tried when material evidence as to the defendant's identification was not presented to the jury, warranting a new trial); *Logan v. State*, 43 Wis. 2d 128, 137, 168 N.W.2d 171 (1969) (where "counsel's confusion resulted in the omission of highly probative evidence," concerning the credibility of the defendant as contrasted with the credibility of the complaining witness, the controversy was not fully tried because the credibility issue was "the crux of the case"). Therefore, we must conclude that the real controversy was not fully tried where "[w]e cannot say with any degree of certainty that the [now challenged] evidence used by the State during trial played little or no part in the jury's verdict." *State v. Hicks*, 202 Wis. 2d 150, 153, 549 N.W.2d 435 (1996).

¶ 38. The only factor under Wis. Stat. § 752.35 applicable here is whether the real controversy of whether Avery was involved in the robberies was fully tried because the jury was precluded from hearing about the evidence that was not commercially available or affordable at the time of trial. The trial court relied on *Hicks* and *State v. Armstrong*, 2005 WI 119, 283 Wis. 2d 639, 700 N.W.2d 98, to conclude that cases involving advances in science and testing technology warranted a new trial under § 752.35 *only* when the new evidence

"totally destroyed the prosecution's theory." Because the trial court concluded that "the photogrammetry evidence could chip away at the prosecution's case but it wouldn't destroy it," the trial court denied the new trial under § 752.35.

¶ 39. No Wisconsin case interpreting Wis. Stat. § 752.35 requires that the defendant's new evidence "totally destroy[] the prosecution's theory." In fact, neither *Armstrong* nor *Hicks* involved evidence that exonerated the defendant, although the new evidence raised sufficient questions of whether the real controversy was fully tried to justify a new trial. *See Armstrong*, 283 Wis. 2d 639, ¶ 2, and *Hicks*, 202 Wis. 2d at 153. Our supreme court explained in *State v. Wyss*, 124 Wis. 2d 681, 370 N.W.2d 745 (1985), that a new trial under the first statutory criteria—that the real controversy has not been fully tried—does not require finding a reasonable probability of a different outcome on retrial. *Id.* at 738. *Wyss* further explained that "[n]ormally, a reviewing court will be unable to predict what the probable outcome will be on retrial when the real controversy was not tried or was so sidetracked and clouded that it may accurately be said that it was not fully tried." *Id* at 739.

¶ 40. The State relies on *State v. Allen*, 159 Wis. 2d 53, 464 N.W.2d 426 (Ct. App. 1990) ("*Allen II*"), to support its argument that we are prohibited from granting a new trial under Wis. Stat. § 752.35. Specifically, the State points to our statement in *Allen II* stating that "[s]ection 752.35 does not permit us to go behind a sec. 974.06 order to reach the judgment of conviction." *See id.* at 56. The State reads this sentence out of the context in which we decided *Allen II*.

¶ 41. *Allen* involved a challenge under Wis. Stat. § 974.06 to jury instructions which included both first

degree intentional homicide and two lesser included homicides. *See State v. Allen*, 154 Wis. 2d 804, 806–07, 454 N.W.2d 44 (Ct. App. 1990) (*"Allen I"*). The instructions were not objected to by Allen at trial, and thus not preserved for appeal. *See id.*; *see also State v. Schumacher*, 144 Wis. 2d 388, 409, 424 N.W.2d 672 (1988). We initially affirmed the trial court's denial of the motion on the grounds that Allen was not prejudiced by the unobjected-to instructions. *See Allen I*, 154 Wis. 2d at 807.

¶ 42. Our supreme court, however, in *Vollmer v. Luety*, 156 Wis. 2d 1, 456 N.W.2d 797 (1990), concluded that an error which the plaintiff failed to preserve for appellate review by failing to object—an allegedly deficient verdict question—prevented the real controversy from being fully tried. *Id.* at 4. Consequently, WIS. STAT. § 752.35 gave us discretionary authority to reverse the judgment and to remand for a new trial. *Vollmer*, 156 Wis. 2d at 4.

¶ 43. After release of its decision in *Vollmer*, our supreme court summarily vacated our decision in *Allen I* and remanded for us to reconsider.[17] On remand, having already determined the unobjected-to instructions could not have prejudiced Allen, we declined to permit WIS. STAT. § 974.06 to be used to breathe procedural life into an appellate issue which did not prejudice the defendant and which had expired by waiver at the trial level. *See Allen II*, 159 Wis. 2d at 55.

¶ 44. Unlike the situation in *Allen* where the request involved a new theory (moving the burden of proof) based on existing facts (jury instructions to which no objection was made), we have a request under

---

[17] *See State v. Allen*, 157 Wis. 2d 265, 459 N.W.2d 461 (1990).

Wɪs. Sᴛᴀᴛ. § 752.35 based on new evidence which is directly material to an issue that was never waived, but rather has been vigorously pursued. Avery vigorously litigated the question of his involvement in the robberies during his trial.

¶ 45. The jury was precluded from hearing photogrammerty evidence because, at the time of trial, the specific technique to sufficiently enhance the video surveillance evidence did not exist. We conclude, as a result, that the real controversy of whether Avery was actually involved in the robberies was not fully tried.

### CONCLUSION

¶ 46. If a jury believes the new evidence, then it would conclude Avery is *not* the man in the video, and thus he could not be one of the robbers. Therefore, we conclude that Avery is entitled to a new trial based on newly discovered evidence, and in the interest of justice under Wɪs. Sᴛᴀᴛ. § 752.35 because the real controversy has not been fully tried.

*By the Court.*—Order reversed and cause remanded for a new trial.

¶ 47. BRENNAN, J. (*dissenting*). I respectfully dissent on both grounds. First, the trial court did not err in its application of the newly discovered evidence test and was correct that there is not a reasonable probability that Avery's new photogrammetry evidence *would* create a reasonable doubt when viewed alongside all of the other evidence. If the test was *possibility* of a different result, then I would join the Majority. It is not.

¶ 48. Second, a new trial is not warranted under Wɪs. Sᴛᴀᴛ. § 752.35 because the new scientific evidence here does not "discredit[]" the old evidence, *see State v.*

*Hicks*, 202 Wis. 2d 150, 171, 549 N.W.2d 435 (1996), such that an exception should be made to the well established and well-reasoned judicial policy of finality.

## I. Newly Discovered Evidence

¶ 49. As to the first ground, newly discovered evidence, there is no dispute that the applicable test is whether the new evidence, alongside *all* of the evidence, *would* create a reasonable probability of reasonable doubt in the jury's mind. *See State v. Love*, 2005 WI 116, ¶ 44, 284 Wis. 2d 111, 700 N.W.2d 62 ("A reasonable probability of a different outcome exists if 'there is a reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt.' ") (citing *State v. McCallum*, 208 Wis. 2d 463, 474, 561 N.W.2d 707 (1997)) (brackets in *Love*). The trial court applied that test and concluded that there was no reasonable probability of reasonable doubt. I agree.

¶ 50. The Majority concludes that the trial court erroneously exercised its discretion by wrongly applying the "test when it weigh[ed] competing credible evidence" and found one expert's opinion less weighty than another expert's opinion. *See* Majority, ¶ 32. The Majority faults the trial court for saying that Avery's expert's opinion was " 'not reliable enough' " to warrant a new trial. *See* Majority, ¶ 31 (emphasis omitted).

¶ 51. The Majority takes the trial court's comment out of context. The trial court was not saying that Avery's new evidence was unworthy of belief, or even that it was less believable than the State's new evidence. Rather, the trial court was saying that, even with Avery's new evidence, the rest of the trial evidence and the State's rebuttal to Avery's new evidence were so

strong, that the trial court could not say that the *jury* would have a reasonable doubt. The trial court was distinguishing the type of new evidence here, an expert's photogrammetry *opinion*, from the type of new evidence in *Hicks*, DNA. DNA is unquestionably "hard" scientific evidence, unlike opinion testimony. In that context, the trial court's remarks were consistent with the correct test and not an erroneous exercise of discretion.

¶ 52. In fact, the newly discovered evidence test *requires* a weighing of *all* of the evidence, new and old, and *requires* a judgment by the reviewing court as to the effect that the new evidence would have on the jury's reasonable doubt decision. If weighing all of the evidence is impermissible, as the Majority says, then the newly discovered evidence test can never be performed.

¶ 53. The trial court's conclusion that the new evidence was not reasonably probable to create reasonable doubt is supported by the record. The record shows that the State's evidence at trial was strong. The State presented two eyewitness identifications, Avery's detailed confession, Avery's unsolicited apology letter and Avery's apology phone call to his mother. Avery's defense was rigorous as well. The jurors had the opportunity to hear him recant his confession and present his alibi. The jurors make the credibility decision and the jurors did not believe him. Nor did they believe the recantation at trial of one of the eyewitnesses.

¶ 54. So, the question for review is whether the new evidence *would*, not *could*, create reasonable doubt. That requires an evaluation of what the new evidence is. Avery's new evidence here is expert opinion, not DNA. It is "softer" scientific evidence in the form of an expert's opinion, which is then *rebutted* by another

589

expert's opinion. Avery's new evidence is distinguishable from both *Hicks* and *State v. Armstrong*, 2005 WI 119, 283 Wis. 2d 639, 700 N.W.2d 98, in which the new evidence consisted of unrebutted DNA evidence that directly contradicted a piece of the State's trial evidence. *See Hicks*, 202 Wis. 2d at 171; *Armstrong*, 283 Wis. 2d 639, ¶ 109. Avery does not cite a case with new evidence of the type presented here where the court has concluded that there is a reasonable probability that the new evidence would cause the jury to have a reasonable doubt.

¶ 55. Not all new evidence entitles a defendant to a new trial. The test requires a reviewing court to look at all of the evidence and determine whether the new evidence would create reasonable doubt. The trial court did that here and should be affirmed.

## II. New Trial in the Interest of Justice under WIS. STAT. § 752.35

¶ 56. As to the second ground, the Majority concludes that Avery is entitled to a new trial under WIS. STAT. § 752.35 on the ground that the real controversy was not fully tried because the jury did not hear the new photogrammetry evidence. In support of its conclusion, the Majority relies on *Hicks*.

¶ 57. I respectfully dissent because granting a new trial in the interest of justice is a power to be used "infrequently and judiciously," *see State v. Ray*, 166 Wis. 2d 855, 874, 481 N.W.2d 288 (Ct. App. 1992), and should only be done in "exceptional cases," *see Hicks*, 202 Wis. 2d at 161. This case does not meet the "exceptional" standard illustrated by *Hicks*. *See id.*

¶ 58. The real controversy here was identification and it was fully litigated at trial. The State presented

two eyewitnesses and Avery's confession. Avery testified and recanted his confession and presented his alibi. *Compare with id.* at 153–56 (indicating that Hicks did not testify at his trial). The jury heard strong rebuttal to the State's identification evidence. Avery recanted his confession. Avery gave reasons why he confessed and why he wrote an unsolicited apology letter to his mother and why he asked to phone her to apologize. Avery presented his alibi himself and through witnesses. The jurors had the opportunity to hear all of that evidence and made their own credibility determination when they found him guilty. The real controversy was fully tried.

¶ 59. Avery's new evidence, an expert's scientific opinion, fails to meet the *Hicks* test for a new trial in the interest of justice. The court in *Hicks* held: "We cannot say with any degree of certainty that the hair evidence used by the State during trial played little or no part in the jury's verdict." *Id.* at 153. In reaching that holding, the supreme court observed that the State had "relied heavily," *id.* at 164, on the hair evidence at trial to prove Hicks' identification. The supreme court noted that Hicks' new DNA evidence directly "discredit[ed]" the State's trial evidence. *Id.* at 171. The supreme court granted Hicks a new trial because it could not say "that the *hair evidence* used by the State during trial played little or no part in the jury's verdict." *Id.* at 158–59 (emphasis added).

¶ 60. The Majority paraphrases, and thus changes, *Hicks*' holding by saying that "[t]herefore, we must conclude that the real controversy was not fully tried where '[w]e cannot say with any degree of certainty that the [*now challenged*] evidence used by the State during trial played little or no part in the jury's verdict.' " *See* Majority, ¶ 37 (citing *Hicks*, 202 Wis. 2d

at 153) (brackets in Majority opinion; emphasis added). There is no piece of "now challenged" evidence in this case.

¶ 61. Avery's new evidence merely "chips away" at identification generally. In contrast, the supreme court observed in *Hicks* that "this is not a case in which the evidence proffered by *Hicks* tended to chip away at the accumulation of evidence produced by the State to prove guilt." *See id.*, 202 Wis. 2d at 171. The implication of the supreme court's statement is that "chipping away" type evidence is insufficient to warrant a new trial. To warrant a new trial, the court found that the evidence must "*discredit*[] *one of the pivotal pieces of evidence* forming the foundation of the State's case." *Id.* (emphasis added). That is not the case here.

¶ 62. Here, Avery's new evidence fails to "discredit[]" any particular piece of the State's evidence. There was no photogrammetry evidence at trial. The State's identification evidence was based on the two eyewitnesses and Avery's confession. Avery's new evidence merely "chips away" at identification generally, but does not "discredit[] one of the pivotal pieces" of the State's trial evidence and therefore does not warrant a new trial under *Hicks. See id.*

¶ 63. Additionally, granting a new trial for every new scientific discovery that "chips away" but does not discredit evidence offered at trial is contrary to long-established judicial policy favoring finality and consistency. *See Love,* 284 Wis. 2d 111, ¶ 58 ("After a defendant's trial and appeal rights have been exhausted, however, our system must become attentive to finality, and to the significant costs in time and money of never-ending challenges to the defendant's conviction. Public resources are limited.") (Prosser, J., dissenting) (citations omitted); *see also Armstrong,* 283 Wis. 2d

592

639, ¶ 180 ("In doing so, the majority opinion misapplies our precedent and equates the idea of the 'matter not being fully tried' with new scientific identification procedures in a way that threatens to reopen convictions statewide every time a scientific improvement occurs, regardless of the lack of a probable effect on the issues underlying the jury's verdict.") (Roggensack, J., dissenting). Applying the test as the Majority would, will lead to mandatory retrials every time there is a new scientific "breakthrough," regardless of whether there is any probable effect on the outcome of the retrial. This lack of finality would undermine the justice system given the very limited public resources. I believe that the record shows that the real controversy, identification, was fully tried, showing no basis for a new trial in the interests of justice. Accordingly, I would affirm the trial court.